**STATE of Tennessee, Appellee,**

**v.**

**Rocky Lee COKER, Appellant.**

Supreme Court of Tennessee,
at Nashville.

Nov. 30, 1987.

Rehearing Denied Feb. 29, 1988.

William C. Killian, Jasper, Howell G. Clements, Chattanooga, for appellant.

W.J. Michael Cody, Atty. Gen. and Reporter, Kymberly Lynn Anne Hattaway, Asst. Atty. Gen., Nashville, for appellee.

## OPINION

FONES, Justice.

This is a direct appeal of a death penalty case. Defendant was found guilty of first degree murder and sentenced to death upon the jury's finding that defendant had a prior conviction of a felony involving violence, T.C.A. § 39–2–203(i)(2) and that this murder was committed, "for remuneration or the promise of remuneration, or employed another to commit the murder for remuneration or the promise of remuneration," T.C.A. § 39–2–203(i)(4).

Cletus Price was shot in the left eye at close range as he sat in his chair at home alone and died almost instantly. He was legally blind.

His wife Peggy had received a telephone call about 9:00 p.m. on 23 October 1984. She left the house in response to the call, returned about 10:00 p.m. and found her husband dead.

Defendant married Peggy Price's daughter by a prior marriage, Levada Broom, in November 1981, and they were divorced in February 1983, at which time defendant was in prison. While defendant was in prison, Peggy Price wrote him daily, visited him on occasion and sent him approximately twenty dollars per week spending money. When defendant was released on parole in July 1984, he moved into a trailer that Peggy Price had purchased for him, located on her brother's land next door to the home she and Cletus Price had built. She paid the utilities and all expenses to maintain defendant in the trailer. She continued to give him money, and they had a sexual relationship. Cletus Price did not know of his wife's involvement with defendant until a short time prior to his death.

Peggy Price was indicted for her role in the murder of her husband but her case was severed upon the State's motion in which she joined. She testified for the State in this case and said that defendant suggested in August 1984 that they do away with her husband. His first suggestion was that she put strychnine in his B.C. Powder. Later he suggested she put rhubarb leaves, then mountain laurel leaves on his hamburger or in a salad. She told defendant that she tried the two types of leaves but with no result, because in fact she did not follow his instructions although telling him she did. She testified that at defendant's request she brought him several vitamin tablets from her husband's bottle of vitamins. Later defendant gave her one of the tablets to return to the bottle saying, "it was ready." She replaced it and a few days later, on October 1, 1984, Cletus had a "spell" and spent fourteen or fifteen days in Erlanger Hospital.

Peggy Price testified that when her husband came home from the hospital, defendant said he knew somebody "that could take care of it." He asked her if it would be worth five thousand dollars to be rid of Cletus and she said, "Yeah."

On 22 October defendant told Peggy he was going away for a few days. On 23 October she received a telephone call just before 9:00 p.m. and a voice that she did not recognize said, "This is the time. Get the hell out. Got it?" She told Cletus she was going to her mama's to take her grandson a Halloween costume she had bought that day and she left the house. She left her mother's and returned home just as the ten o'clock news came on, and as stated above, found her husband had been shot. She ran to the police station, which was just on the other side of the courthouse square from her house.

The investigators found numerous letters from Peggy Price to defendant and vice versa, and questioned her after the funeral. She denied any involvement in the murder and insisted that her relationship with defendant was strictly platonic. However, on 1 November 1984 she gave a statement admitting involvement in her husband's

murder and agreeing to cooperate with the police. T.B.I. officers placed tape recorders on her phone at the Radio Shack, a business she owned located near her home. Several phone calls between Peggy Price and defendant were recorded, in which the murder and the pay-off were discussed. In those conversations the price of the murder was increased to $10,000, $5,000 to pay the person who killed Cletus Price and $5,000 to defendant for arranging it. Peggy Price was fitted with a body mike and on the night of 8 November a meeting with defendant at the Price home was taped. Defendant warned her that terrible things would happen if the pay off was not made and arrangements were made for it to take place the next day.

On 9 November Peggy Price withdrew $10,000 from the bank, and placed it in a hole in the ground near her store, in accord with defendant's instructions. The T.B.I. video taped her putting the money in the hole and defendant taking it out. The money was recovered and defendant was arrested.

There was substantial circumstantial evidence that defendant hired Mickey Lee Davis, also known as "50–50", to kill Cletus Price. One of defendant's fellow inmates at an Alabama Federal Prison in March 1984 testified that defendant had discussed with him various means of disposing of his girlfriend's husband and said that he could get "a guy named Davis out of Chattanooga to handle it." There was proof that Mickey Lee Davis and his brother, Kenneth Dewayne Davis, were frequently seen at Gene Ruth Motors on Rossville Boulevard in Chattanooga; that Mr. Ruth had directed the Davis brothers to use a pay phone nearby because of their frequent use of his business phone; and that calls were placed from that pay phone to defendant's trailer home on 24 October and 4 November 1984; that three calls were placed from defendant's trailer to Gene Ruth Motors on 20 October, four calls on 22 October, three calls on 28 October, four calls on 29 October, two calls on 30 October, five calls on 4 November, one call on 7 November, and one call on 8 November. On 4 November one call was placed from Gene Ruth Motors to defendant's residence. On 9 November two collect calls were made from a pay telephone several blocks from Gene Ruth Motors to defendant's residence and a call was made from defendant's trailer to Gene

Ruth Motors that day. Obviously, the dates of calls to and from defendant and the Davis brothers coincide with significant events about the murder and defendant's pay-off arrangements with Peggy Price.

On 9 November 1984, a red Ford Mustang was seen near defendant's trailer in Dunlap, and later that day Kenneth Davis was stopped in that vehicle, arrested and searched. He had a piece of cardboard on which was written the telephone number of defendant's trailer and the telephone number of defendant's sister's residence in Dalton, Georgia.[1]

Defendant testified at the trial. He said Mrs. Price told him she had hired someone to kill her husband and needed his help to make the payoff, and that she had made and received a number of long distance telephone calls on his telephone at the trailer. He denied that he had hired Davis to kill Cletus Price and denied having had an affair with Peggy Price.

█ Defendant asserts that the trial judge erred in charging the jury that, although rebuttable, all homicides are presumed to be malicious, in violation of Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). It is true that the charge in this case violated Sandstrom. It is also true that much has been written by this Court and the United States Supreme Court since Sandstrom about the necessity of using "inferred" instead of "presumed" and the other minor adjustments in the charge that would eliminate this issue. Nevertheless, it is settled that this constitutional error may be found to be harmless beyond a reasonable doubt, even where the defendant contests the issue of malice at trial. See, e.g. Rose v. Clark, 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986). The record in this case establishes, by overwhelming evidence, a long term intent on the part of defendant to get rid of Cletus Price, the husband of his lover and financial supporter. He told his fellow inmate in the Alabama prison he wanted Cletus Price out of the way to get all of the money. His defense at trial was that he was not involved, except as a "scapegoat" for Mrs. Price. Thus, there was no direct issue of whether malicious intent existed. The United States Supreme Court has made it clear in Rose v. Clark, supra, that even where the evidence presents a valid jury issue with respect to the existence of

---

1. Defendant placed a call from the trailer in Dunlap to his sister's residence in Dalton, Georgia on 21 October 1984, just prior to telling Peggy Price he would be gone for a few days.

malice, a *Sandstrom* error can be found to be harmless. We find the evidence of defendant's guilt and of the presence of malicious intent so overwhelming that the erroneous charge was harmless beyond a reasonable doubt.

■ Defendant complains of the exclusion for cause of prospective juror Thelma Phillips. Defendant insists that "despite her general reservations about capital punishment" she was qualified to serve as a juror in this case, under the tests prescribed in *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) and *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). Mrs. Phillips responses can only be characterized as equivocal. She had positive religious scruples against taking someone's life and indicated that voting as a juror for the death penalty would be the same as "going out and shooting him." On the other hand she said, "if the law told me to do so," she could vote to impose the death penalty. Admittedly, it was a close question whether or not her views and beliefs would substantially impair the performance of her duties as a juror in a capital punishment case. However, a careful reading of the entire voir dire examination of Mrs. Phillips persuades us that the trial judge was correct in dismissing her for cause. The record reflects that the trial judge allowed full exploration of Mrs. Phillips' views and applied the correct standard prescribed by the United States Supreme Court in his determination of her lack of qualification to serve.

Defendant subpoenaed five jurors to the hearing on his motion for new trial and attempted to present evidence that the validity of the jury verdict was tainted by improper influence, allegedly extraneous prejudicial information.

Defendant's first question asked, "Was there a discussion among the jurors concerning the fact of some of you jurors could have a contract out on you if you didn't sentence him to death?" After the trial judge sustained an objection to that question, counsel for defendant restated his question as follows, "My question, Your Honor, was did some jurors import knowledge or facts that unless this jury sentenced Mr. Coker to death, that they would be the object of a contract killing?"

The trial judge sustained objections to both questions, because in his opinion, the questions related only to "the processes by which the jury reached their verdict, the thoughts and discussions in the jury room."

In *State v. Blackwell,* 664 S.W.2d 686 (Tenn.1984) we adopted rule 606(b) of the Federal Rules of Evidence to control the admissibility of evidence to impeach a jury verdict. That rule prohibits testimony on any matter or statement occurring during the course of the jury's deliberations or the effect of anything upon a juror's mind or emotions as influencing his or her vote. However, the rule allows a juror to testify on the question of whether extraneous prejudicial information was brought to the jury's attention, or whether any outside influence was improperly brought to bear upon any juror.

■ It is true that the second question propounded by counsel for defendant contains at least a hint of outside influence. Extraneous means "coming from without" and the fact that one or more jurors may have commented about the possibility of defendant employing a third person to murder one or more jurors would not be admissible unless the comment included information that the threat originated from and was transmitted to the jury by an outside source. If defendant had any evidence of the jury's exposure to such an outside threat, an offer of proof should have been made after the trial judge's ruling upon the two questions propounded. *See State v. Goad,* 707 S.W.2d 846 (Tenn.1986). In the absence of such an offer we find no merit to this issue.

Defendant raises the issue of the impropriety of qualifying prospective jurors on their attitude toward capital punishment, which allegedly produces a jury biased in favor of the State on the issue of guilt or innocence. That question was spawned by *Grigsby v. Mabry,* 758 F.2d 226 (8th Cir. 1985), rejected by this Court in *State v. McKay,* 680 S.W.2d 447 (Tenn.1984) and by the United States Supreme Court in *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986).

Defendant contends the trial judge erred in denying his motion to suppress the testimony of T.B.I. Agent Shelton about the content of two telephone calls to defendant's trailer home on 9 November 1984, the day of the pay-off. Shelton was present in the trailer, answered the calls and represented to the callers that he was defendant Coker. One was from "50–50" Davis and

the other from an unidentified person calling on behalf of "50–50". Both calls were about the delivery of the pay-off money by Coker to "50–50" or his designee.

The basis of defendant's motion to suppress that evidence was that the search warrant which resulted in Agent Shelton's presence in the trailer when the calls came in was invalid because it was obtained by false allegations in the affidavit made in support of the request for the warrant. Specifically, defendant says that at the time the warrant was issued, 9:20 a.m. on 9 November, the officer knew that the money was not on the Coker premises, because the money had not been delivered to the agreed place by Peggy Price at that time. However, the affidavit clearly stated that the pay-off "will be concealed" on the defendant's premises and that it would be reeled into defendant's trailer with a fishing hook and line. The trial judge correctly ruled that an anticipatory search warrant was issued and was valid under the circumstances. We find that no false statements or fraudulent representations were made to procure the warrant.

■ Defendant does not question the legal propriety of an anticipatory search warrant. There is respectable authority that anticipatory search warrants do not violate the Fourth Amendment under factual circumstances similar to those in the instant case. *See Johnson v. State*, 617 P.2d 1117 (Alaska 1980); *Alvidres v. Superior Court*, 12 Cal.App.3d 575, 90 Cal.Rptr. 682 (1970) and *People v. Glen*, 30 N.Y.2d 252, 331 N.Y.S.2d 656, 282 N.E.2d 614 (1972) and 2 LaFave, Search and Seizure § 3.7(c) (2nd ed. 1987).

Defendant contends that the trial judge erred in allowing the reading of the transcript of a tape recording to the jury and allowing the jurors to have copies to read along with the witness and while the tape was being played.

The tape was of poor quality and there was considerable background noise, including a barking dog. Before playing the tape to the jury the investigator from the D.A.'s Office, who when the recording was made was posted in a closet to insure the safety of Mrs. Price, was allowed to read to the jury a transcript of the recording. He testified that the transcript contained an accurate account of what was recorded on the tape. The trial judge had compared the tape and the transcript for accuracy prior thereto. The jury had been furnished copies to enable them to follow along as the investigator read the transcript, all over the objection of counsel.

■ Defendant's complaint about that procedure was predicated upon the best evidence rule. As a general rule, tape recordings probably fall within the scope of the best evidence rule. *See* McCormick on Evidence, § 232 (3d ed. 1984) and Annot., 58 A.L.R.3d 589 (1974). However, in *State v. Caldwell*, 671 S.W.2d 459 (Tenn.1984) we rejected defendant's "best evidence" objection where only a redacted transcript was read to the jury. That tape was edited to protect the defendant because it dealt with defendant's involvement in another murder. In *State v. Jones*, 598 S.W.2d 209 (Tenn.1980), we held that:

the tape recordings and compared transcripts are admissible and may be presented in evidence by any witness who was present during their recording or who monitored the conversations, if he was so situated and circumstanced that he was in a position to identify the declarant with certainty, and provided his testimony in whole, or in part, comports with other rules of evidence.

598 S.W.2d at 223.

We find that the testimony of Officer Harrison and his and the trial judge's comparison of the tape and transcript for accuracy, fully met all of the requirements of *State v. Jones, supra*, and the admission of the transcript did not violate the best evidence rule.

Defendant asserts that the trial judge abused his discretion in granting the State's motion to sever the trials of defendant and his co-defendant, Peggy Price. Mrs. Price's counsel joined in the motion and they informed the trial court that Mrs. Price would be a witness for the State in the trial of defendant and would thereafter enter a plea of guilty.

■ The granting or denial of a motion for severance is addressed to the sound discretion of the trial judge and prejudice must be shown to obtain a reversal upon appeal. *State v. Coleman,* 619 S.W.2d 112 (Tenn.1981). Mrs. Price had a right to plead guilty and defendant had no right to force her to forego that right and go to trial along with him.

Defendant's allegation that he suffered prejudice because Mrs. Price's credibility was a central issue in the case has no substance because Mrs. Price testified, admitted her part in the murder, and was subject to full cross examination at defendant's trial. This issue has no merit.

Defendant contends that the trial judge erroneously admitted evidence offered by the State over defendant's objection and that if proper rulings had been made the evidence would be insufficient to support the jury's verdict of first degree murder.

■ Defendant says that Mrs. Price's testimony that weeks before the murder her husband told her that Coker would have to move, was inadmissible hearsay. Perhaps so, but that was not what happened. Mrs. Price testified that she told defendant Coker that her husband said defendant would have to move or he would burn the trailer; that Coker's response was, "That son of a bitch, I ain't going nowhere. He'll have to go." The statement was not offered as proof of the matter asserted therein, but for its effect upon defendant, to wit, supplying evidence of his

motive, and as such was admissible. *See State v. Venable,* 606 S.W.2d 298, 301 (Tenn.Crim.App.1980).

■ Next defendant says the testimony of Agent Shelton relating the substance of the two telephone calls to defendant's trailer on 9 November was inadmissible hearsay. The evidence had established the existence of a conspiracy between defendant and "50–50" Davis, Kenneth Davis and Mrs. Price to commit murder for hire. The telephone calls were by and on behalf of defendant's co-conspirators in promotion of the conspiracy and admissible against the conspirator on trial. *See State v. Thomas,* 691 S.W.2d 571 (Tenn.Crim.App.1985). Defendant contends that the conspiracy was over because Coker had been in custody for a few hours when the calls were made. The purpose of the calls was to arrange the pick-up of the pay-off, obviously an integral part of the conspiracy to the Davis brothers.

■ Next defendant says Mrs. Price's testimony about the telephone call telling her to get out of the house on the night of the murder was inadmissible hearsay. That evidence was not offered to show the truth of the matter asserted but to explain Mrs. Price's action in leaving the house prior to the murder. That evidence was also admissible as declarations of a co-conspirator against the conspirator on trial as in the preceding issue.

■ Defendant complains of the admission of that portion of the tape and transcript of the 8 November conversation with Mrs. Price at her home wherein defendant tells Mrs. Price that he will not take a polygraph test. Defendant failed to direct any objection at trial to the admission of that portion of the tape and that waiver forecloses consideration of the issue on appeal. If error, it was minuscule in significance, harmless beyond a reasonable doubt.

■ We find that the evidence of defendant's guilt of murder in the first degree fully satisfied the standard prescribed in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) and T.R. A.P. 13(e).

Defendant says the trial judge erred in excluding the testimony of Dr. Charles R. Adcock and the hospital records of Cletus Price's admissions in March and October 1984.

Defendant sought to prove by Dr. Adcock that when Cletus Price was hospitalized in March 1984, he was suffering from strychnine poisoning. At that time defendant was still in prison and defendant sought to attack Mrs. Price's credibility by showing she had a more active role in the conspiracy than she acknowledged.

■ Dr. Adcock was a general practitioner, an emergency room physician who had never examined Mr. Price, but proposed to testify based entirely upon his review of the hospital records. The trial judge listened to defendant's offer of proof by Dr. Adcock and ruled that his testimony was speculative and that the doctor "cannot with any degree of medical certainty state that this man on those occasions, either occasion, was suffering from poisoning."

None of the physicians who actually saw Cletus Price diagnosed his condition as poisoning. On the March admission the hospital records showed a diagnosis of kidney stone. On the October admission the diagnosis was initially uncertain, but ultimately was a compressed vertebrae and kidney problems.

Dr. Adcock admitted that Mr. Price's symptoms were consistent with the diagnosis of kidney problems. Although he had never seen a case of strychnine poisoning, he said that on the March admission Mr. Price could have been suffering from strychnine poisoning. He admitted that that opinion was "only a speculation or a possibility." Dr. Adcock's opinion testimony clearly falls short of the degree of medical certainty necessary for admissibility. *See, e.g., Lindsey v. Miami Development Corp.,* 689 S.W.2d 856, 862 (Tenn.1985).

■ Next defendant says it was error not to allow the introduction of the hospital records of the March and October 1984 admissions of Cletus Price. The trial judge correctly held that without medical expertise to decipher them they were irrelevant and lacked probative value for the jury. The records contain nothing in support of defendant's theory that Mrs. Price poisoned her husband in March and his insistence that the hospital records should have been admitted is wholly without merit.

Defendant contends that exhibits nineteen and twenty should have been excluded because of the State's alleged violation of Rule 16, T.R.Crim.P. in not providing notice of those items pre-trial in accord with the court's discovery order.

Exhibit nineteen was a telephone log showing that two phone calls were made from a pay phone near Gene Ruth Motors to defendant's trailer. One call was made on 24 October 1984 at 11:13 p.m. and the second call on 4 November 1984 at 2:56 p.m. Niles Kitchen, a South Central Bell staff manager in charge of security, was the witness who identified the telephone log that recorded the two calls along with numerous others. Defendant objected on the ground that he had not been furnished that particular log in accord with the discovery order of the court. The District Attorney asserted that he had ordered his staff to furnish defendant's counsel all of the telephone logs that the staff had subpoenaed and he believed that they had been so furnished. The trial court did not rule on the admissibility of exhibit nineteen at that time.

Exhibit twenty was then introduced consisting of five sheets of telephone logs on legal sized paper and a sixth sheet, eight by eleven, a xerox copy of South Central Bell's telephone bill to Gene Ruth Motors. That bill listed calls from 11 October through 7 November 1984, two of which were to a Dunlap, Tennessee, number identified as defendant's trailer. The first call was made on 20 October at 9:12 p.m. and the second on 4 November at 9:30 a.m. Defendant's counsel admitted that he had received the first five sheets of telephone logs where most of the calls were recorded but denied receiving the sixth sheet, the Gene Ruth phone bill showing two calls.

Later in the trial defendant's counsel submitted a handwritten affidavit wherein he makes oath that exhibit nineteen had not been furnished him at any time prior to its introduction into evidence. At that time defendant's counsel made the following statement to the court:

Mr. Killian: Well, I am not talking about those other phone records, I was furnished those. Not those in exhibit nineteen and that's what that affidavit refers to.

We hold that defendant waived any objection to exhibit twenty. If we assume that the two telephone calls shown on exhibit nineteen were erroneously admitted, it is clear beyond a reasonable doubt that that was harmless error. The other exhibits reflect numerous telephone calls between defendants and the Davis brothers.

Defendant contends the trial judge erred in admitting two photographs showing the victim's wounds, on the ground that their prejudicial effect outweighed their probative value.

The photographs were introduced through the testimony of Dr. Graves, the medical examiner, to show the victim's wounds. Exhibit three shows a side view of Cletus Price's body from the shoulder up, lying in the chair where it was found. Blood is splattered on his head and on the books and the table beside him. Exhibit four shows Cletus Price's head and neck from the left side, after his body had been cleaned up at the hospital. Exhibit four shows a small wound near the victim's left ear which Dr. Graves said was apparently a knife wound.

Exhibit four clearly had probative value and was not gruesome or otherwise prejudicial to defendant. However, exhibit three is of doubtful probative value and while not pleasant neither is it inflammatory. Its admissibility was marginal but conceding that it was error, it was harmless beyond a reasonable doubt in view of the overwhelming evidence of defendant's guilt.

Pursuant to T.C.A. § 39–2–205 we have reviewed the sentence of death in this case and are of the opinion that its imposition was neither arbitrary nor disproportionate.

The judgment of conviction of first degree murder and the sentence of death are affirmed. Unless stayed or otherwise ordered by proper authority the sentence will be carried out as provided by law on the 29th day of February, 1988. Costs are adjudged against defendant.

HARBISON, C.J., and COOPER and DROWOTA, JJ., concur.

BROCK, J., dissents, see separate opinion.

BROCK, Justice, dissenting.

I dissent from the imposition of the death sentence for the reasons stated in my dissenting opinion in *State v. Dicks*, Tenn., 615 S.W.2d 126, 132 (1981); in all other respect I concur in the opinion of the Court.

OPINION ON PETITION TO REHEAR

FONES, Justice.

Defendant has filed an earnest and respectful petition asking the Court to reconsider two issues dealt with in the opinion heretofore released, to-wit: the exclusion for cause of prospective juror Thelma Phillips; and defendant's contention that the jury verdict was tainted by extraneous prejudicial information.

The Court has carefully reconsidered those issues and is satisfied that they were correctly decided.

The petition to rehear is respectfully denied.

HARBISON, C.J. and COOPER, BROCK, and DROWOTA, JJ, concur.