IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

## STATE OF TENNESSEE v. LARRY CURRIE, ET AL.

**Direct Appeal from the Circuit Court for Henry County**
**No. 12754     Julian P. Guinn, Judge**

---

**No. W1999-01532-CCA-R3-CD - Decided June 28, 2000**

---

The defendants, Larry Currie and Christopher Curtis Love, appeal as of right from the jury verdict in the Henry County trial court that found them guilty of aggravated assault of the victim, Reginald Franklin Thompson.[1]  Each defendant was sentenced to three (3) years with one (1) year of continuous confinement and the balance on supervised probation.  Both defendants filed motions for a new trial, which were denied by the trial court.  The defendants collectively raise two issues for our consideration: (1) whether there was sufficient evidence for a rational trier of fact to find the defendants guilty of aggravated assault beyond a reasonable doubt; and (2) whether the jury improperly considered facts that were not in evidence in reaching its verdict.  After careful review of the record, we AFFIRM the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Circuit Court is Affirmed.**

LAFFERTY, SR. J., delivered the opinion of the court, in which TIPTON, J., and WELLES, J., joined.

Victoria L. DiBonaventura, Barton F. Robison and Jim L. Fields, Paris, Tennessee, for the appellants, Larry Currie and Christopher Curtis Love.

Paul G. Summers, Attorney General and Reporter, and J. Ross Dyer, Assistant Attorney General, for the appellee, State of Tennessee.

### OPINION

This case was tried on December 7, 1998.  The victim testified that on the morning of March 31, 1998, he drove to the house where his ex-girlfriend, Philistine Tharpe, lived with their infant son and her current boyfriend, James King.  King was also a friend of the three defendants.  The victim testified that his purpose in going there was to get money from Ms. Tharpe for a Fish Fry Parade float that their son was to ride on.  He had previously left a message for Ms. Tharpe at her mother's house concerning the money.  The victim had enlisted a friend, Timmy Tharpe, to go with him in

---

[1]The defendant, Bobby Lee Thomas, Jr. is deceased.

case there was trouble with King and his friends. King had previously made threats and comments to the victim on several occasions when he had been to Ms. Tharpe's home to pick up his baby.

When the victim arrived at the residence, he saw four men standing or working on a car in the driveway. The victim got out of his car, which he had parked on the street, and walked onto an embankment next to the street, directly in front of the residence. According to the victim, King asked him what he was doing there, to which the victim replied that he was not there to start trouble but only to talk to Tilly (Ms. Tharpe). King told the victim, "[G]et out of my f___ing yard, and get in your car before I kick your ass." As he spoke, King came down some steps toward the embankment with Currie on his right and Thomas and Love on his left. The victim testified that Tilly then came out of the house, and he told her he needed to talk to her. King made more threatening comments to the victim about speaking to Tilly. The victim denied making any threats to the defendants during this altercation.

As the victim and his friend, Timmy, turned back to get into their cars, Currie pushed the victim from the back. The victim stated that he stumbled on the embankment and was struck in the face by King. As he fell into the street, Currie, Love, and Thomas began to kick and punch him. The victim was able to get up on his feet but was backed up into a construction site across the street from Tilly's house. The four men caught up with him, and Thomas struck the victim in the back with a two by four board while the others continued their attack. The victim's friend, Timmy, drove his car into the construction site to scatter the attackers and pick up the victim. In the fray, Thomas struck Timmy's car in the front with the board. Timmy spun his car around, and the back end hit Thomas, who hit the car in the rear with the board. As the victim ran to his own car, Love brandished a sawed off shotgun at the victim and said, "I'll shoot you, nigger. . . .I'll kill you, nigger." The victim stated that Love also pointed the gun at Timmy. The two men left the scene and drove to the home of Timmy's father, who called the authorities.

At trial, the victim identified a photograph of the car Timmy was driving that showed the damage to the car. He testified that he received deep scratches on his face, neck, and back, as well as a swollen lip, and identified two photographs depicting his injuries. The victim stated that he did not go to the hospital but treated himself for his injuries.

On cross-examination, the victim testified that he showed the investigating officer, Jock Bass, the portion of his back where Thomas hit him with the board, but the officer did not take a picture of his back, because there was no mark from the board. The victim admitted that he had seen Tilly earlier that morning and had an opportunity to discuss the float money with her but forgot to do so.

Timmy Tharpe, the victim's friend, also testified at trial. He explained that he and the victim arrived at Tilly's residence in separate cars on the morning of the incident. He remained in his car at first but could tell that the victim and King were engaged in an argument. Tilly came out of the house, and Timmy saw the four men coming toward the victim. Timmy then exited his car to prevent an altercation from occurring but was grabbed by Tilly as the victim was being attacked by the four. He stated that the victim did nothing to provoke the attack and that King and his friends

threw the first punches. According to Timmy, the men began hitting the victim with two by fours in his back and legs after reaching the field across the street from the residence. He estimated that the four men hit the victim more than five times with the two by four boards. Timmy admitted driving his car into the field to pick up the victim but denied knowing that he had hit defendant Thomas at the time. As he was leaving the scene with the victim, he saw Love holding a shotgun down at his side next to his leg. Timmy ducked when he saw the gun. He estimated that the altercation between the victim and defendants lasted approximately thirty (30) minutes from start to finish.

Jock Bass, the investigating officer on the case, testified that he observed the victim's injuries on March 31, 1998, but did not look under his clothing. He stated that the incident was first reported as a hit-and-run with Bobby Thomas as the victim; however, based on his investigation, Officer Bass ultimately charged the defendants, including Bobby Thomas, with aggravated assault of the victim. Officer Bass conducted a search of Tilly's home but did not find a sawed off shotgun on the premises; nor did he find any clubs or two by fours in the house. He stated that there was a house being framed on the lot across the street from the scene, and a lot of wood and other items were lying around the construction area. He did not remember seeing any blood on anything at the construction site.

Defendant Larry Donnell Currie, Jr., testified in his own defense. He stated that he had gone to Tilly's and King's residence on the morning of March 31, 1998, to hook up a stereo in King's car. While he was working on the car, the victim and Timmy Tharpe pulled up in separate cars, and the victim asked King if he had a message for him. Currie heard King tell the victim to stay out of the yard, and words were exchanged between the two. According to Currie, the victim told King that his mother was a "bitch," and a fight broke out between the two, with King striking the first blow. When Currie approached the arguing men, the victim told Timmy to get one of the men while he got the other. Currie denied seeing anyone with a two by four, a sawed off shotgun, or any other weapon. He described how Timmy drove his car into the field, hit Thomas, spun his car around, and attempted to hit him again with the car before leaving the scene with the victim. He also denied seeing Thomas or Love fighting or hitting anyone. Currie testified that Tilly called the police to report the disturbance. He denied ever threatening the victim or pushing him in the back during the incident.

Bobby Lee Thomas, Jr., testified in his own behalf. His account of the events was essentially the same as Currie's, except that he testified that the victim threw the first punch after he exchanged words with King. He denied swinging at anyone and stated that he was not sure if Currie swung at anyone or not. According to Thomas, he went back across the street after the fight moved to the construction site, because he knew the police had been called. The next thing he knew, he was on top of Timmy's car. He pushed himself off onto the ground, and Timmy turned the car around again. Thomas testified that he rolled out of the way. He was taken by ambulance to the hospital for treatment. Thomas stated that he filed a complaint against Timmy Tharpe, but he was arrested before he was allowed to file a report. He denied seeing anyone with a two by four board or a stick that day. He also denied swinging a stick at Timmy's car.

On rebuttal, the State put the victim back on the stand. He denied using vulgar language in his conversation with King or telling Timmy to get one of the men. He stated that he never went onto Tilly and King's property but proceeded only as far as the sidewalk.

## SUFFICIENCY OF EVIDENCE

The defendants each assert that the evidence at trial was insufficient to sustain a guilty verdict for aggravated assault. The defendants' initial presumption of innocence is lost following a jury conviction and replaced with a presumption of guilt; thus, on appeal, the burden is now shifted to the defendants to prove the insufficiency of the evidence. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must affirm the convictions unless the evidence presented at trial was so deficient that no rational trier of fact could have found all of the essential elements of the offense beyond a reasonable doubt. Tenn. R. App. P. 13(e); *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994). This rule has been found by our courts to be applicable to a conviction based on direct or circumstantial evidence or a combination of both. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App.), *perm. app. denied*, (Tenn. 1990).

In determining whether the evidence was sufficient to support a conviction, we do not re-weigh the evidence or substitute our own inferences for those of the jury. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Furthermore, the State is entitled to the strongest legitimate view of the evidence presented and all reasonable inferences drawn therefrom. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992), *cert. denied*, 507 U.S. 954, 113 S. Ct. 1368 (1993). A jury verdict accredits the testimony of the State's witnesses and resolves all conflicts in favor of the State's theory. *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983).

With this standard in mind, we believe that the evidence, when viewed in the light most favorable to the State, supports both defendants' convictions for aggravated assault. Tennessee Code Annotated § 39-13-101 states in pertinent part:

> (a) A person commits assault who:
>
> > (2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury

Tennessee Code Annotated § 39-13-102 states in pertinent part:

> (a) A person commits aggravated assault who:
>
> > (1) Intentionally or knowingly commits an assault as defined in § 39-13-101 and:
> >
> > * * *
> >
> > (B) Uses or displays a deadly weapon.

-4-

The defendants were indicted by the State under the theory that they caused the victim to reasonably fear imminent bodily harm by use or display of a stick, a two by four board, and a sawed-off shotgun. Both the victim and his friend, Timmy Tharpe, testified that the victim did nothing to provoke the attack but asked only to talk to his ex-girlfriend, Tilly. Both testified that King initiated the fight that morning and that King and the defendants aggressively approached and pursued the victim across the street to the construction site, where they continued their attack. Even defendant Currie testified that King threw the first blow. The victim testified that Currie, Love, and Thomas began to attack him after he was knocked down by King. Officer Bass testified that he began his investigation as a hit-and-run with defendant Thomas as the victim, but, as a result of his investigation and interview of witnesses, he ended up charging the defendants with aggravated assault. Both the victim and Timmy testified that the defendants wielded at least one two by four board and that Love displayed a sawed-off shotgun as they were trying to leave the scene. Both testified that Thomas hit Timmy's car with a board or stick when he drove his car into the construction site to scatter the defendants. In addition, there was photographic evidence of injuries to the victim and damage to the car that Timmy Tharpe drove into the construction site to rescue his friend that supports the victim's story. The fact that Thomas was hit by Timmy's car also supports this version of the events. The jury simply did not believe the defendants' version of the events, and we defer to the trier of fact's judgment on the credibility of these witnesses. There is no merit to this issue.

**IMPROPER JURY VERDICT**

The defendant, Larry Currie, alleges that the jury verdict was tainted, because the jury considered facts not in evidence in reaching their verdict. However, the defendant does not specify in his brief what extraneous information the jurors improperly considered. He alleges that a juror, McDowell, stated "that the decision of the jurors to convict was based upon extraneous information." After a careful review of the entire record, we find no basis to overturn the jury's verdict and affirm the trial court's denial of the defendant's motion for a new trial.

In *State v. Blackwell*, 664 S.W.2d 686 (Tenn. 1984), the Supreme Court adopted Rule 606(b) of the Federal Rules of Evidence and defined the type of evidence admissible from a juror to impeach a jury verdict. *Blackwell,* 664 S.W.2d at 688-90. This holding, subsequently established as Rule 606(b) of the Tennessee Rules of Evidence, prohibits a juror from giving testimony on any matter or statement occurring during the course of the jury's deliberations or the effect of anything upon a juror's mind or emotion as influencing his or her vote. *See* Tenn. R. Evid. 606(b). However, the rule permits a juror to testify on the question of whether any extraneous prejudicial information was improperly brought to bear upon any juror. *See id.*

The defendant has the burden of establishing that some prejudicial extraneous information, fact, or opinion was imparted to a juror by a third person or that some improper outside influence was brought to bear on a juror. *State v. Clinton*, 754 S.W.2d 100, 103 (Tenn. Crim. App.), *perm. app. denied,* (Tenn. 1988).

If it is shown that one or more jurors has been exposed to extraneous prejudicial information or improper influence, there arises a presumption of prejudice, and the burden then shifts to the prosecution to explain the conduct or to demonstrate the harmlessness of it. *State v. Parchman*, 973 S.W.2d 607, 612 (Tenn. 1997); *State v. Young*, 866 S.W.2d 194, 196 (Tenn. Crim. App. 1992).

At the hearing on defendant Currie's motion for a new trial, the trial court expressed extreme reservation at putting the jurors under oath, because Currie had not filed any affidavits to establish a substantial ground for the trial court to believe that there was any jury impropriety. The trial court permitted defense counsel to state the substance of the defendant's position, which was based on statements made to defense counsel by a juror, McDowell. McDowell apparently told defense counsel that "facts not in evidence, but facts brought to light by one or more of the other jury persons … the decision of the jurors to convict was based upon that extraneous information." Stranger still, the juror, McDowell, was not subpoenaed as a witness at the hearing.

Jurors Allen, Puckett, VanDyke, Kidd, Maness, and Atkinson were questioned by the trial court, under oath, as to what evidence formed the basis of their jury verdict. Allen, Puckett, VanDyke, Kidd, and Atkinson testified that they did not consider any extraneous information but used only the evidence at trial and the law as given by the court in reaching their respective verdicts.

Juror Maness gave the only testimony that raised a question of extraneous prejudicial information during jury deliberations, which follows:

Q:     (by the trial judge)  Did you, in arriving at your decision, consider any extraneous prejudicial information; that is, facts, arguments, or evidence from outside of what you heard during the trial of the case?
A:     Yes.
Q.     You did?
A.     I did.
Q:     What did you consider that was prejudicial?
A:     Well, I –  The talk that there was about gangs and things like that.  I considered the evidence and then this –
Q.     Hold on just a minute.

\* \* \*

Q:     I don't want to get into what talk and arguments were.  I want to know did the jury consider outside prejudicial information in arriving at their decision?

\* \* \*

A:     I can only speak for myself.  And it's – I felt there was guilt, but I – I think the – the talk might have had an effect.  I have to admit that.
Q.     Okay.  You thought there was guilt?
A.     Yes.
Q:     Is that the reason you voted guilty?

-6-

A:    Yes.

Q.    Did you decide the case solely upon the evidence that you heard in the courtroom and the law given to you by the Court?

A:    I tried to. I believe I did. I had that – That had an effect. When you hear something it does have an effect. But I felt he [Currie] was guilty.

In denying the defendant's motion for a new trial, the trial court commented:

> The standard matter for attacking a jury's verdict is by the execution of an affidavit that falls within the parameters of the Evidentiary Rules that control this.
>
> * * *
>
> I notice significantly that the juror who supposedly led to all of this is not present here today. I suspect, and based upon past experience, the reason he's not is because words tend to take on a little bit different color. One has a tendency to hear what they want to hear and it just doesn't come out that way when you get them under oath and start questioning them.

Improper extraneous information is information from outside the jury itself. *State v. Coker*, 746 S.W.2d 167, 171 (Tenn. 1987); *Caldararo v. Vanderbilt University*, 794 S.W.2d 738, 742 (Tenn. Ct. App.), *perm. app. denied*, (Tenn. 1990). Internal pressure or intimidation by other jurors, premature jury deliberations that are contrary to the trial court's instructions, a juror's personal experiences that are not directly related to the case, a juror's thoughts, fears, or emotions and speculation among jurors about the consequences of a verdict have been found to be internal matters that do not constitute extraneous information or outside influences. *Caldararo*, 794 S.W.2d at 742 (citations omitted). However, external influences that could warrant a new trial, if found to be prejudicial, include: (1) exposure to news reports about the trial; (2) consideration of facts not in evidence; and (3) communications with a third party non-juror about the case. *Id.*

From our review of the record, we are not sure just what extraneous prejudicial information prompted the juror, McDowell, to make such a statement to defense counsel. McDowell did not testify. Although juror Maness testified that extraneous prejudicial information pertaining to gangs was mentioned among the jury members, the record reveals that the victim testified that on March 31, 1998, the defendant, Currie, made the statement to him, "[Y]ou better recognize the vice lords."[2] From a close and careful reading of the testimony of juror Maness, we are convinced that her verdict of guilty was based upon the evidence and law submitted by the trial court to the jury. What jurors

---

[2]The trial court sustained the defendant's objection to this response on the grounds that the question was beyond the scope of cross-examination. The trial court did not give a curative instruction to the jury, nor was such instruction requested. It appears, then, that there was reference to gangs during the trial itself that was not outside information.

may hear during the course of a trial and from the comments of fellow jurors about their personal experiences during jury deliberations, may have an affect on their mental processes, but these are not considered to be extraneous information that would invalidate a jury's verdict. Although Maness stated the information about gangs had an affect on her, she still believed the defendant to be guilty of the offense of aggravated assault. Likewise, we note that the record established at the conclusion of the trial that each juror was polled and acknowledged the verdict of guilty. Thus, we conclude that the defendant has failed to meet his burden to establish that extraneous information was considered by this jury that prejudiced its verdict against Currie. The trial court's denial of the defendant's motion for a new trial is affirmed.