IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
February 7, 2006 Session

**STATE OF TENNESSEE v. JAMES LEON MILLER**

**Appeal from the Circuit Court for Gibson County**
**No. H-7665    Clayburn Peeples, Judge**

———————

**No. W2005-01571-CCA-R3-CD  - Filed April 12, 2006**

———————

On May 15, 2004, the victim, Charles Lawuary, was shot and killed in Humboldt, Tennessee in an area known as "the crossing." A bystander was grazed by a bullet. The defendant, James L. Miller, and a co-defendant, Charles Lewis, were later arrested for the shootings. The Gibson County Grand Jury indicted the defendant for criminal responsibility for first degree murder and criminal responsibility for aggravated assault. Following a jury trial held on March 21, 2005, the jury found the defendant guilty as charged. The defendant was sentenced to life in prison for the murder conviction and six years for the aggravated assault conviction, to be served concurrently with the life sentence. The defendant appeals, arguing that, the State failed to prove the venue of the crime, the trial judge failed to charge the natural and probable consequences rule to the jury, there was juror misconduct when one juror felt she was coerced into voting for a guilty verdict, and there was insufficient evidence to support the defendant's conviction. We have reviewed the record in this case and affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID H. WELLES and NORMA MCGEE OGLE, JJ., joined.

Harold R. Gunn, Humboldt, Tennessee, for the appellant, James Leon Miller.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Gary Brown, District Attorney General; and Edward L. Hardister, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

Charles Lewis is the co-defendant in this case. He admitted shooting the murder victim on May 15. He made a deal with the State to plead guilty to second degree murder and in exchange would testify at the defendant's trial. Around May 4, Charles Lawuary came up to Lewis and asked Lewis if Lewis and the defendant were talking about robbing him for his money. Lewis called the defendant, who was on his way back from Jackson. The defendant subsequently called Lawaury and proceeded to argue with him on the phone. Lewis and the defendant then proceeded to the defendant's girlfriend's house. Lawuary shot at the defendant and the co-defendant while they were at the defendant's girlfriend's house. Lawuary fired four or five times, and the defendant fired back with a .45 caliber weapon. The defendant claimed he accidentally shot his girlfriend's car during this altercation. Lewis and the defendant decided that if they ever saw Lawuary again there were "going to get him."

On May 4, 2004, Sergeant Dennis Wright, who is in the Criminal Investigation Division of the Humboldt Police Department, received a report of a shooting incident. The defendant reported the May 4 incident. In the May 4 shooting investigation, the defendant reported to Sergeant Wright that a man wearing a bandana around his face walked up to the house where he was and began shooting. The defendant indicated to Sergeant Wright that Charles Lawuary was the shooter on May 4. Sergeant Wright found bullet holes in a vehicle in front of the house. Sergeant Wright found it unusual that the entrances of these bullet holes were from a southernly direction, but the shooter would have been shooting from a northerly direction. He found one spent .45 caliber shell casing in the vehicle. There were no other bullet holes or spent shell casings found in the investigation.

About one or two weeks later Lewis saw Lawuary. Lewis was riding in a car with Charles Davis and Lawuary was riding in a car with Chris Lofton, also known as "Gorilla". They stopped the cars so that they could speak to each other. After Lewis saw Lawuary riding with Lofton, Lewis told the defendant, also known as Red, that he had seen Lawuary. Lewis told the defendant about Lawuary because Lawuary was "still running around Humboldt like – like he ain't done nothing to nobody." Lewis then met up with the defendant near a barber shop. The defendant handed Lewis a .45 caliber gun in a brown paper bag. Lewis saw the car in which Lawuary was riding.

When the car stopped Lawuary got out of the car and walked toward the store. At this point, Lewis began walking toward the store while carrying the .45 caliber weapon he had received from the defendant. Lewis stated at trial that when the defendant gave him the gun, he and the defendant had planned to kill Lawuary. Lewis stood outside the store between two cars. He saw Roy Turner and informed him he was about to shoot Lawuary. When Lawuary came out of the store, Lewis waited a few minutes and began shooting him. Lewis did not believe that Lawuary had any idea that Lewis was at the scene or about to shoot him.

The victim did not put up any resistance or shoot back. After he shot Lawuary, Lewis began to run. He met a police car and ran in the opposite direction. Lewis ran to a friend's house, where the defendant joined him and retrieved his gun.

Carl Wade, Jr., was at "the crossing" on May 15 standing in front of Joe's Pool Room talking to his cousin. He heard three shots, then realized that he had been shot. There was no argument or disturbance before the shooting. Mr. Wade required six stitches to his head and was released. Fortunately, he did not have any residual problems related to the injury.

Anthony McKnight was at his mother-in-law's house on May 15. He knew the defendant enough to recognize him. When he left the house, he saw the defendant coming out of a house talking on a cell phone and sticking a brown paper bag into the waistband of his pants. The object in the bag was black and had a handle. Mr. McKnight thought it looked like a gun. Mr. McKnight overheard the defendant talking on the cell phone and telling the person on the other end of the line, "Do what you've got to do."

Claude Thomas was at the barber shop near the crossing on May 15. Mr. Thomas and Gorilla, who is Mr. Lofton, were waiting for haircuts at the barbershop. Mr. Thomas and Gorilla were standing outside smoking and the defendant came over and talked to Gorilla. The defendant told Gorilla to, "keep that guy out of your car." Mr. Thomas then heard shots. Then he heard the defendant say, "There's the guy laying on the ground now." Thomas saw a police car and went over to see what had happened.

Roy Turner was a witness to the May 15 shooting. Mr. Turner was going to the store when he saw the co-defendant Charles Lewis, also known as "Smokey", cross the railroad track. When Lewis approached Mr. Turner he told him to get out of the way because he was going to shoot Lawuary. When Lawuary came out of the store, the co-defendant started shooting him. Lawuary never flinched, looked back or attempted to run. Lewis fired five shot striking Lawuary in the head. Then Lewis ran, but had to turn around when he was approached by the police. Mr. Turner did not see the defendant at "the crossing" that day.

Mr. Pledge is the defendant's nephew and lives in Iowa. A few days after the May 15 shooting, the defendant went to Iowa. The defendant was in the area about two weeks until he was arrested at a hotel in Illinois. When Mr. Pledge went to pick up his uncle, he saw that the defendant had a .45 caliber gun in his possession. While riding in the car, the defendant told Mr. Pledge not to stop the car if the police arrived because the defendant was "on the run." Mr. Pledge was also told that the defendant was supposed to be up on a murder charge.

On May 15, 2004, Sergeant Wright investigated the shooting death of Lawuary. The victim died from a gunshot wound to the head. Sergeant Wright completed an investigation of the area of the shooting known as "the crossing." He described street names as well as business names on a diagram of the area of the shooting. Sergeant Wright found four spent .45 caliber shell casings near the body of the victim. There was no evidence of any return fire by the victim. Sergeant Wright also

found an additional victim who had been standing outside of a business near where the victim was shot. Sergeant Wright believed that a bullet ricocheted off the wall of the building and struck Carl Wade, the other victim, in the back of the head. This bullet caused a grazing injury. Sergeant Wright recovered a bullet from Lawuary's head that was taken out during surgery at the hospital.

At the time of the May 15 shooting, an Officer Brad York of the Humboldt Police Department was looking for Charles Lawuary. He received a call from a female that the individual involved in the shooting on May 4 was in a trailer on Calhoun Street. Officer York did not find the individual. Officer York heard shots from the direction of "the crossing" and he ran there. York called in that there was a man lying on the street. Officer York saw a black male subject running away from the scene. A police car headed toward the subject, and Officer York saw the subject remove a gun from his waistband and point it toward the police car. The subject then turned and began running again.

Bill Baker is the Assistant Chief of Police at Humboldt. He transported a bullet removed from Lawuary's head and a bullet removed from the car involved in the May 4 shooting to the Tennessee Bureau of Investigation Crime Lab. Steve Scott of the TBI tested the bullets and concluded that they were both fired by the same gun.

After the May 15 shooting, Sergeant Wright found the defendant in Iowa after hearing several reports that he had left the state. The defendant was arrested in Rock Island, either Illinois or Iowa. The defendant's arrest and the return to Tennessee occurred within about a month of the shooting.

On July 26, 2004 the Grand Jury of Gibson County indicted the defendant for one count of criminal responsibility for first degree murder and one count of criminal responsibility of aggravated assault. A jury trial was held on March 21, 2005. At the conclusion of the trial, the jury found the defendant guilty of both counts. The trial court then sentenced the defendant to life imprisonment without possibility of parole on the criminal responsibility for first degree murder conviction. The trial court held a sentencing hearing on July 1, 2005 for the second count of criminal responsibility for aggravated assault. The trial court sentenced the defendant to six years to run concurrently to the life sentence. The defendant filed a timely notice of appeal.

## ANALYSIS

The defendant argues four issues on appeal: (1) whether the State proved the venue of the crime; (2) whether the trial judge charged the natural and probable consequences rule to the jury; (3) whether there was juror misconduct when one juror felt she was coerced into voting for a guilty verdict; and (4) whether there was sufficient evidence to support the defendant's conviction.

## VENUE OF INCIDENT

The defendant's first issue is that the State did not prove the venue of the crime by a preponderance of the evidence. After citing Tennessee Code Annotated section 39-11-201(e), which states that "venue [must] be proven by a preponderance of the evidence," the defendant states, "The State made references to the Crossing and Humboldt, but never showed by a preponderance of the evidence that the crime occurred in Humboldt, Gibson County, Tennessee." This is the defendant's argument in its entirety. The State argues that the venue of the crime was proven by a preponderance of the evidence.

Article I, Section 9 of the Tennessee Constitution states that an accused must be tried in the county in which the crime is committed. Proof of venue is necessary to establish the trial court's jurisdiction. See Harvey v. State, 376 S.W.2d 497, 498 (Tenn. 1964); Hopson v. State, 299 S.W.2d 11, 14 (Tenn. 1957). However, venue is a question for the jury and is not actually an element of the offense charged. The State only needs to prove by a preponderance of the evidence that the charged offense was committed in the county in which the defendant is being tried. See Tenn. Code Ann. § 39-11-201(e); State v. Bennett, 549 S.W.2d 949, 949-50 (Tenn. 1977); State v. Anderson, 985 S.W.2d 9, 15 (Tenn. Crim. App. 1997). Venue may be proven by circumstantial evidence, and even slight evidence is sufficient if it is uncontradicted. Bennett, 549 S.W.2d at 950. In determining venue, the jury is entitled to draw reasonable inferences from the evidence. State v. Johnson, 673 S.W.2d 877, 882 (Tenn. Crim. App. 1984).

Sergeant Wright testified that the shooting occurred in Humboldt and that he was a member of the Humboldt Police Department. In addition, he prepared a diagram of the downtown area known as "the crossing" to help explain his testimony. Other witnesses also referred to the fact that the shooting occurred in Humboldt. This proof was never contradicted during the trial. We conclude that based on these facts a reasonable trier of fact could reasonably have found by a preponderance of the evidence that the offenses occurred in the town of Humboldt in Gibson County, Tennessee.

Therefore, this issue is without merit.

## NATURAL AND PROBABLE CONSEQUENCES CHARGE

The defendant also argues that the jury was not instructed on the natural and probable consequences rule. The defendant makes no references to the jury instruction. Although the heading in the defendant's brief is that the trial court did not properly instruct on the natural and probable consequences rule. The defendant's argument, in its entirety, is as follows:

> The defendant was charged with Criminal Responsibilities for First Degree Murder. For the jury to find defendant guilty based on the natural and probable consequences rule, the State must prove beyond a reasonable doubt and the jury must

find the following: (1) the elements of the crime or crimes that accompanied the target crime; (2) that the defendant was criminally responsible pursuant to Tennessee Code Annotated section 39-11-402; and (3) that the other crimes that were committed were natural and probable consequences of the target crime. State v. Howard, (Tenn. 2000), 30 S.W.3d 271 at p. 276.

".... we're going to get him. That was it." This phrase can not equate to premeditated murder. "I had followed Lawuary toward the store." This phrase can not equate to premeditated murder.

Because the jury was not properly instructed on the natural and probable consequences rule and did not have the opportunity to determine whether this element was proved, defendant's conviction for premeditated murder must be reversed.

In actuality, the defendant's argument appears to be an argument concerning the sufficiency of the evidence to support the verdict. We will address that issue later in the opinion.

The jury instructions are in the record and, we have found that the trial court did indeed instruct the jury on the natural and probable consequences rule. Therefore, the defendant's position on appeal is not only puzzling it is without merit.

## JUROR MISCONDUCT

The defendant also argues that there was juror misconduct because a juror stated that she was "maybe pressured" or "coerced." The State argues that the defendant has been unable to prove that there was any extraneous influence on the jury deliberations, and, therefore the trial court did not abuse its discretion in denying the defendant's motion for new trial.

The juror in question testified at the hearing on the motion for new trial. She stated that following the trial, she called the defendant's attorney and informed him that she was unhappy with the verdict in the defendant's case. The trial court asked the juror what her concerns were about the verdict. The following is her reply:

A.      I didn't agree with the verdict. When we went in, we were discussing the verdict. I mean, what we was going to come up with. The – I feel like my first mind was to go with not guilty and after we discussed it and went on and they were reading over the documents that we had in front of us, which the first degree murder or the second degree, and we discussed that and I asked, you know, about the second degree murder – was conspiracy or – because I didn't feel like Red was – he didn't pull the trigger. He didn't kill the guy that was killed, so – but, instead of going with my first mind and speaking up and saying that I didn't agree with them – I feel like there was

-6-

so much commotion in there and so many – you know, well, this was going on and this was going on. I should have just spoken up and changed my vote, that I wanted to go with not guilty of first degree murder, but I didn't, and then after I got home I couldn't sleep. I had been worried and that's when I called Mr. Gunn and talked to him about that and I didn't question while I was in the jury room with the rest of them of my decision.

Q. All right. You will recall, I'm sure, after the jury came back out I did what they call poll the jury and I asked each of you if that was your verdict.

A. Yes, sir.

Q. And you agreed to that verdict at that time.

A. Yes, I did.

Q. Did you feel you were under any sort of coercion or threat or pressure to vote guilty as opposed to not guilty?

A. I would say being in the room with, you know, with everybody, just – I don't know if I could say coerced or pressured or maybe pressured. It was – I don't know. It was more or less just sort – of just went with – just looked at one thing, the first thing to go with – first degree, and I guess you could say pressured.

Q. Would it be – did you feel under any sort of threat?

A. No.

Q. Would it be correct to say that after you returned home you felt that you had voted incorrectly?

A. Yes.

Q. But at the time you delivered the verdict, that was, in fact, your verdict. Is that correct?

A. Yes, that was my verdict, but I didn't feel comfortable with it. Even after I voted and put it in the – went with the rest of them, I felt like then I should have changed my mind. I should have went with my first mind to say, no, I don't want to go this way, but I just –

Q. So you felt you should act one way but you did not act that way?

A.      Correct.


A trial court's decision as to whether to grant a motion for a new trial based on juror misconduct is within the sound discretion of the trial court and will not be overturned absent an abuse of discretion.  State v. Dellinger, 79 S.W.3d 458, 494 (Tenn. 2002).  Rule 606(b) of the Tennessee Rules of Evidence states:


> (b) Inquiry Into Validity of Verdict or Indictment.  Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes, except that a juror may testify on the question of whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion; nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.


In Walsh v. State, 166 S.W.3d 641, 649 (Tenn. 2005), the Tennessee Supreme Court held that Rule 606(b) of the Tennessee Rules of Evidence permits juror testimony to establish the fact of extraneous information or improper influence on the juror; however, juror testimony concerning the effect of such information or influence on the juror's deliberative processes is inadmissible. However, a juror is not permitted to testify about anything occurring during deliberations, including the juror's own internal thoughts, motivations or emotions.  Id.

Our supreme court has held that "extraneous information" is information from a source outside the jury.  State v. Coker, 746 S.W.2d 167, 171 (Tenn. 1987).  Thus, intra-jury pressure or intimidation, State v. Hailey, 658 S.W.2d 547, 553 (Tenn. Crim. App. 1983), premature jury deliberations contrary to the trial court's instructions, State v. Frazier, 683 S.W.2d 346, 353 (Tenn. Crim. App. 1984), and speculation about a verdict's consequences, State v. Workman, 667 S.W.2d 44, 51-52 (Tenn. 1984), have been found to be internal matters that do not involve extraneous information or outside influence.

When the defendant has shown that a juror has been "exposed to extraneous prejudicial information or subjected to improper influence," the burden then shifts to the State to prove that the conduct was harmless because a rebuttable presumption of prejudice arises.  Walsh, 166 S.W.3d at 647.

In the case sub judice, the juror testified concerning her questioning of the verdict after the verdict had been rendered.  She did not testify regarding any extraneous influence on her decision

or that of the jury. She, in effect, testified that she was influenced by her assumption that the other jurors were going to vote guilty. As we set out above, a juror may not testify concerning her own thought process or even the jury's process regarding the jury's deliberation. Clearly, under Rule 606(b), such evidence is not admissible. The juror's testimony at the defendant's hearing on his motion for new trial is exactly the kind of evidence which should have been excluded by Rule 606(b).

This issue is without merit because the defendant was unable to prove that there was extraneous influence on the juror in question.

## SUFFICIENCY OF THE EVIDENCE

The defendant argues that the State did not prove that he was an "accomplice." When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the state. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. Id. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Harris, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." See Tuggle, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." Matthews, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The defendant was convicted of criminal responsibility for first degree murder and criminal responsibility for aggravated assault. "A person is criminally responsible for an offense committed by the conduct of another if . . . [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense . . . ." Tenn. Code Ann. § 39-11-402(2). First degree murder is "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Aggravated assault, as indicted, is the intentional and knowing commission of an assault by the use of a deadly weapon. Tenn. Code Ann. § 39-13-102(a)(1)(B).

In our review, we must determine whether a reasonable trier of fact could conclude that the defendant acted with intent to aid or assist the co-defendant in the shooting of Lawuary and the aggravated assault victim.

When viewing the evidence in favor of the State and keeping in mind that the jury is the sole arbiter of the credibility of witnesses and weight to be given to the testimony, we conclude that the evidence presented at the trial is sufficient to support the defendant's convictions. The evidence showed that there was an altercation between the victim and the defendant on May 4, prior to the murder of the victim. The co-defendant admitted that he and the defendant planned to get the victim following the May 4 shooting. The co-defendant testified he saw Lawuary on May 15 and called the defendant. He met with the defendant and the defendant gave him a .45 caliber gun in a brown paper bag. Another witnesses testified that he saw the defendant leave a house and stick a brown paper bag into the waistband of his pants on May 15. Witnesses at the scene of the murder stated that they saw both the defendant and the co-defendant at the scene prior to the shooting. Following the shooting, the co-defendant ran away and later met the defendant who retrieved the gun. The defendant's nephew testified that the defendant came to Iowa a few days after the murder. The defendant told his nephew that he was on the run. The defendant had a .45 caliber gun in his possession when he was with his nephew. In addition, tests run by the State on a bullet removed from the victim's head and a bullet removed from an SUV involved in the May 4 shooting were from the same weapon, a .45 caliber gun.

Clearly, a trier of fact could reasonably conclude that the defendant aided the co-defendant by giving him the gun and leaving the State with a weapon that a jury could reasonably conclude was the murder weapon.

Therefore, this issue is without merit.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

_____
JERRY L. SMITH, JUDGE