# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs September 27, 2000 Session

## STATE OF TENNESSEE v. BOBBY WELLS, JR.

### Direct Appeal from the Criminal Court for Monroe County
### No. 99-095     R. Steven Bebb, Judge

---

### No. E2000-01496-CCA-R3-CD
### June 28, 2001

---

A Monroe County jury convicted the defendant of the sale of .5 grams or more of cocaine and of a separate offense involving the sale of less than .5 grams of cocaine. For these crimes the trial court sentenced him to nine years and four years respectively as a Range I, standard offender. These sentences were ordered to run concurrently with one another.[1] Furthermore, the jury assessed the defendant a fifteen thousand dollar fine on each conviction. At a subsequent hearing the trial court denied his new trial motion and revoked his probation from previous offenses. Appealing these decisions, the defendant raises the following six issues: 1) whether the trial court erred by permitting the State to introduce transcripts of taped conversations allegedly transpiring between the defendant and informant when such transcripts were admitted through a police officer who neither heard nor electronically monitored the involved conversations; 2) whether the trial court erred by permitting the prosecution to play and introduce the aforementioned tapes through the same officer; 3) whether the State failed to prove chain of custody because it neither called the lab technician who placed the evidence in the vault at the crime laboratory nor complied with Tennessee Rule of Evidence 803(6); 4) whether the trial court erred in refusing to grant the defendant a new trial based on newly discovered evidence involving the informant's motive for testifying against the defendant; 5) whether sufficient evidence existed to support the conviction; and 6) whether the defendant's probation revocation should stand when such was based upon the above-outlined new convictions and not the defendant's failure to report as was alleged in the probation violation warrant and when the convictions forming the basis for the revocation are allegedly not supported by sufficient evidence. After a review of the record, we find these claims to lack merit and, therefore, affirm the lower court's actions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

---

[1] The effective nine-year sentence was, however, ordered to run consecutively to the sentences on two previous convictions.

JERRY L. SMITH, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, J., and JAMES CURWOOD WITT, JR., J., joined.

Charles M. Corn, Public Defender, Cleveland, Tennessee, for appellant, Bobby Wells Jr.

Paul G. Summers, Attorney General & Reporter; Peter M. Coughlan, Assistant Attorney General; Jerry N. Estes, District Attorney General; Shari Tayloe, Assistant Attorney General; for appellee, State of Tennessee.

## OPINION

### Factual Background

On September 25, 1998, the informant Jerome Ervin met at the National Guard Armory with James Kile and Patrick Upton. At that time Kile was with the 10th Judicial District Drug Task Force, and Upton was a captain with the Sweetwater Police Department. Previously Ervin had agreed to make an undercover purchase of narcotics in exchange for being placed on community corrections early. At the armory the officers searched Ervin and his car to ensure that he did not already have any drugs. Thereafter Kile gave the informant a micro-recorder and one hundred dollars instructing him to acquire crack cocaine. As Ervin departed the armory, he was followed in a separate vehicle by Kile and Upton. The informant was out of the officers' direct observation for a few minutes in part because the area around the defendant's house afforded no good place to conceal themselves; however, Kile and Upton resumed observation as Ervin left the residence. Upon returning to the armory, Ervin returned the tape recorder and presented the officers with four rocks of a white substance later identified as a total of .7 grams of cocaine.[2] According to the informant, he had acquired the narcotics from the defendant.

A little over one month later, Ervin again met with Kile behind the armory. The same search procedure was utilized after which Kile gave the informant the micro-recorder along with sixty dollars to use in purchasing the drugs. Thereafter Kile followed the informant to the defendant's home and saw Ervin enter the house. A few minutes later the officer and Ervin proceeded in their respective vehicles to the armory. Upon arrival the informant presented Kile with the recorder and one rock of a white substance subsequently found to be .3 grams of cocaine. Ervin stated that he had also purchased the latter object from the defendant.

After hearing this and other proof, the jury convicted the defendant as charged. As above-noted, the defendant now brings this appeal raising six issues.

### The Playing and Introduction of Taped Conversations
### and the Introduction of Transcripts of These Conversations

Because the defendant's first two issues are interrelated, they will be considered jointly here. We initially turn to the defendant's assertion that the trial court erred in permitting the prosecution

---

[2] More specific proof concerning chain of custody will be detailed in the discussion of the issue involving this matter.

to play and introduce through Officer Kile tapes of the conversations between Ervin and the defendant during the drug transactions. In support of his contention that such was inappropriate, the defendant points to the fact that Kile neither heard nor electronically monitored the conversations as they transpired.

At the outset we note that the Tennessee Supreme Court has provided that:

tape recordings and compared transcripts are admissible and may be presented in evidence by any witness who was present during their recording or who monitored the conversations, if he was so situated and circumstanced that he was in a position to identify the declarant with certainty, and provided his testimony in whole, or in part, comports with other rules of evidence.

State v. Jones, 598 S.W.2d 209, 223 (Tenn. 1980), overruled on other grounds by State v. Shropshire, 874 S.W.2d 634, 638 (Tenn. Crim. App. 1993). See also State v. Robert Bacon, No. 03C01-9608-CR-00308, 1998 WL 6925 at *11 (Tenn. Crim. App. at Knoxville, Jan. 8, 1998); State v. Coker, 746 S.W.2d 167, 172 (Tenn. 1987).

In this case, though Officer Kile's voice was the first and last on both tapes, he did not claim to have been otherwise present nor to have monitored the conversations as they had transpired. Nevertheless, at trial the defense specifically elected not to object to the playing and introduction of the tapes during Officer Kile's testimony as long as the informant was to be later called.[3] Ervin did testify following Officer Kile. Having acquiesced to the admission of the tapes, the defendant may not now successfully seek relief because of it. See Tenn. R. App P. 36(a).

Realizing this, the defendant asserts that the matter involves plain error. However, in order for this Court to find plain error, the error must affect a substantial right of the accused. See Tenn. R. Crim. P. 52(b). Within his argument the defendant does not elaborate on what substantial right has been violated, and as is reflected in the remainder of the analysis of this issue, we do not find that this alleged error needs to be addressed to "do substantial justice." See id.

Turning to the matter of the transcripts, the record reflects that the defendant did timely lodge an objection to their use by the jury. Asserting at trial the rationales behind his objections, defense counsel stated "... we object on ... the best evidence, and ... we think that the only person that can put the transcript together is the guy who was there and the confidential informant."

In examining the first of these objections, we observe that the transcripts were not admitted into evidence and were permitted for use only as aids during the playing of the tapes. Furthermore, the trial judge gave the following instruction before the first tape was heard:

Ladies and gentlemen, the reason [defense counsel] objected is because the tape is the best evidence. I will allow a transcript to be used to help you, but you need to understand that the transcript is not evidence and the tape is evidence. A human being transcribed that and so you listen very carefully and take as evidence only what you hear on tape."

---

[3] At the point at which the prosecutor sought to play the tapes, she asked to approach the bench with defense counsel to determine if he objected to her introducing the tapes through Kile. While stating that such was "technically objectionable," defense counsel indicated that he had no opposition to her doing so as long as the informant was going to subsequently testify.

The law presumes that juries follow the instructions they receive absent clear and convincing proof to the contrary. <u>See</u>, <u>e.g.</u>, <u>State v. Vanzant</u>, 659 S.W.2d 816, 819 (Tenn. Crim. App. 1983). Counsel makes no reference to any evidence that the jury disregarded the trial court's instruction nor does our review of the record reveal any. We must presume, therefore, that the jury followed the instruction.

Moreover, as to the defendant's asserted need for the parties involved in the conversation to have compiled the transcripts, Officer Kile testified that the informant Ervin had assisted in doing so,[4] and the State called the informant as its next witness. Had defense counsel any questions regarding the accuracy of the transcripts, he could have cross-examined Ervin concerning this matter, yet he chose not to do so. Thus, though procedurally the trial court did not follow the guidelines from <u>Jones</u>, 598 S.W.2d at 223, for the admission of tapes and the use of transcripts the defendant consented to the admission of the tapes through Officer Kile, the informant assisted in making the contested transcription, and the defense had the opportunity to question the informant about the content of the tapes. In view of these facts, any error is harmless. <u>See</u> Tenn. R. App. P. 36(b). For these reasons this issue is meritless.

## Chain of Custody

The defendant next contends that the prosecution failed to establish the requisite chain of custody for the cocaine because: 1) the State did not call the individual who had received the drugs from law enforcement and had locked away the substances in a vault for subsequent examination by forensic scientists; and 2) the State did not follow the procedure for the introduction of records as set out in Tennessee Rule of Evidence 803(6).

Before tangible evidence may be introduced, the party offering the evidence must either call a witness who is able to identify the evidence or must establish an unbroken chain of custody. <u>State v. Holloman</u>, 835 S.W.2d 42, 46 (Tenn. Crim. App. 1992). "However, the failure to call all of the witnesses who handled the evidence does not necessarily preclude its admission into evidence." <u>State v. Holbrooks</u>, 983 S.W.2d 697, 701 (Tenn. Crim. App. 1998). Indeed, "[t]he identity of tangible evidence need not be proved beyond all possibility of doubt and all possibility of tampering need not be excluded." <u>State v. Ferguson</u>, 741 S.W.2d 125, 127 (Tenn. Crim. App. 1987). Rather, "[i]t is sufficient if the facts establish a reasonable assurance of the identity of the evidence." <u>State v. Woods</u>, 806 S.W.2d 205, 212 (Tenn. Crim. App. 1990). "Whether the required chain of custody has been sufficiently established to justify the admission of evidence is a matter committed to the sound discretion of the trial court, and the court's determination will not be overturned in the absence of a clearly mistaken exercise of that discretion." <u>Holloman</u>, 835 S.W.2d at 46.

As the case <u>sub judice</u> involves distinct narcotics convictions arising from two separate sales, two chains of custody are involved. With respect to the .7 grams of cocaine, the informant gave four crack rocks to Officer Kile. Kile placed the cocaine in a white film container and then an envelope he had prepared. Upon arriving at the drug task force office, he deposited the cocaine as packaged in an evidence locker for which only Ken Wilson, the director and custodian of evidence for the 10th Judicial District Drug Task Force, had the key. Wilson later retrieved the package from the box, logged it, gave it a custodial number, and placed it in a drop box to be taken to the Tennessee Bureau

---

[4] Requiring a defendant to admit that he was present at a drug buy and to actually take part in making a transcript thereof with the informant is obviously not an applicable standard relative to the use of transcripts and this portion of the defendant's argument merits no further comment.

of Investigation (TBI) crime laboratory. In this instance, Wilson himself subsequently took the cocaine to the lab in Chattanooga and gave it to "Barbara," the individual who worked the front desk.[5] According to the TBI form admitted as exhibit seven in this case, the evidence was received from Ken Wilson by B. Sheets. Upon testifying, Jeff Wee-eng, a TBI forensic scientist, stated that the latter was Barbara Sheets, the lab's evidence technician. In reference to the form, Wee-eng explained that the laboratory policy required this form to accompany any evidence admitted. He added that the individual receiving the evidence must sign for it on this form; provide the name of the person from whom they had received it along with the time and date; and assign the evidence a laboratory number. Furthermore, Wee-eng affirmed that this was a record kept in the lab's normal course of business. Thereafter, this witness stated that he had removed the substance from the vault where Sheets would have placed it and that the glued seal of the evidence bag had not indicated any tampering had occurred. After testing the substance and determining as aforementioned that it was .7 grams of cocaine, he resealed it in the bag using staples and plastic evidence tape. He then placed his initials on the tape and again locked the bag in the vault. Reserve Detective Jim Wales and the officer secretary picked up the cocaine from "the person in charge of the TBI lab."[6] The pair then returned the cocaine to Ken Wilson at the task force.

Turning to the substance obtained in the second sale, the procedure followed was the same though the individuals varied somewhat. Again Ervin handed the cocaine to Kile upon arriving at the armory. Thereafter Kile placed the cocaine in a film canister, prepared the evidence envelope, and deposited the package into the evidence locker at the task force. In this instance, Jim Wales took the cocaine to the TBI lab. The TBI form reflects that Barbara Sheets also received the substance; however, the examining forensic scientist was Alex Brodhag. Like Wee-eng, Brodhag also affirmed that these forms were records "normally kept in the course of business" and stated that these forms were "filled out when [the evidence] comes to the laboratory." According to Brodhag the bag in which the subject was held when he had first obtained it had been sealed and had shown no signs of tampering. He added that his evaluation of the rock revealed that it was .3 grams of cocaine. And according to the aforementioned form Wilson retrieved the evidence from Barbara Sheets.[7] Thereafter he returned it the drug task force.[8]

The State did not call Barbara Sheets; however, her position in the chain was made apparent by the TBI forms (and some corroborating testimony). As such, the defendant challenges whether these forms satisfied the business record exception to the hearsay rule under Tennessee Rule of

---

[5] Wilson added that Barbara "usually always takes" in the evidence.

[6] Wales candidly acknowledged that he could not recall the individual's name.

[7] Though Wilson could not recall the full name of the person from whom he had retrieved the evidence, he stated that her first name was Barbara and added "she's the one that handles all the, whenever we go, anything that's entered in the TBI lab, she receives it and then if we go pick up anything we retrieve it from there."

[8] Without objection from the defendant, the State provided two additional types of records. One of these consisted of the pages on which Wilson had logged in the two sets of cocaine upon their initial arrivals at the station. The other involved forms indicating when the evidence had been checked out from and returned to the task force, who did so, who received it, etc.

Evidence 803(6). At the time of trial,[9] this rule stated that the following is not excluded by the rule against the admission of hearsay into evidence

> A memorandum, report, record, or data compilation in any form of acts, events, conditions, opinions, or diagnoses made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes every kind of business, institution, association, profession, occupation, and calling, whether or not conducted for profit.

Tenn. R. Evid. 803(6).

Applying this to the case presently before us, we find that the TBI forms were properly admitted pursuant to this exception. The combined testimonies of Wee-eng and Brodhag prove that the portions of the TBI forms involving Barbara Sheets were made at or near the time of the activity recorded by an individual with personal knowledge and the business duty to make the report in the course of regularly conducted business. See Tenn. R. Evid. 803(6); State v. Carroll, 36 S.W.3d 854, 868 (Tenn. Crim. App. 1999). Furthermore, though technically not custodians of the records, these witnesses were "qualified" to provide the necessary testimony as among other things they were "personally familiar with the business's record-keeping systems and ... able to explain the record-keeping procedures." Id. (quoting Alexander v. Inman, 903 S.W.2d 686, 700 (Tenn. Ct. App. 1995)). Finally, this testimony also establishes a chain of custody sufficient to allow the admission of the drugs into evidence. Having reached these determinations, we see no abuse of discretion by the trial court in admitting the drugs and conclude that the defendant's issue lacks merit.

### Newly Discovered Evidence Relative to the Informant's Motivation for Testifying

Through his next issue the defendant asserts that he should be granted a new trial because of newly discovered evidence concerning the informant Ervin's reason for testifying against him. To receive a new trial on the ground of newly discovered evidence, a defendant must demonstrate "(1) reasonable diligence in seeking the newly discovered evidence; (2) materiality of the evidence"; and (3) the likelihood that the evidence would change the outcome of the trial. State v. Nichols, 877 S.W.2d 722, 737 (Tenn. 1994) (citing State v. Goswick, 656 S.W.2d 355, 358-60 (Tenn. 1983)). Additionally, the decision regarding whether to grant or deny a motion for a new trial predicated on newly discovered evidence "rests in the sound discretion of the trial court." State v. Walker, 910 S.W.2d 381, 395 (Tenn. 1995). Moreover, the trial court is authorized to ascertain the credibility of newly discovered evidence for which the new trial is desired, and the motion should be denied unless the court has assured itself that the testimony would be worthy of belief by the jury. Id.

---

[9] Since the trial of this case Tennessee has adopted Rule of Evidence 902(11), which allows the authentication of various business records by affidavit. This new rule should be read in conjunction with Rule 803(6).

(quoting Rosenthal v. State, 200 Tenn. 178, 292 S.W.2d 1, 5, cert. denied, 352 U.S. 934, 77 S.Ct. 222, 1 L.Ed.2d 160 (1956)). As a general rule, "newly discovered impeachment evidence will not constitute grounds for a new trial .... But if the impeaching evidence is so crucial to the defendant's guilt or innocence that its admission will probably result in an acquittal, a new trial may be ordered." State v. Singleton, 853 S.W.2d 490, 496 (Tenn. 1993) (citing State v. Rogers, 703 S.W.2d 166, 169 (Tenn. Crim. App. 1985); Rosenthal, 292 S.W.2d at 4-5; Evans v. State, 557 S.W.2d 927, 938 (Tenn. Crim. App. 1977)).

Looking more particularly at the claim presented to this Court, the defendant avers that the informant Ervin testified against him because of a threat that Ervin's children would be taken from him. This "newly discovered evidence" was offered at the new trial motion hearing through Lawrence Butts, a fellow prisoner convicted of attempted second degree murder. According to Butts the conversation in which Ervin provided this explanation took place in the laundry room of the jail on the morning Ervin was to testify.

In response the State called Officer Kile and Gary Conners, a community corrections official. While acknowledging the possibility that "some other officer" might have spoken with Ervin about his children, Kile maintained that Ervin had approached him in an effort to work out an agreement whereby he would more quickly be placed on community corrections. Kile added that in a pre-trial meeting at which he was present along with Ervin and Assistant District Attorney Shari Tayloe, Ervin had indicated that his serving as an informant had been "for an early release on community corrections." Ervin made no mention at that time of any threat involving his child. Following Kile, Conners testified that he had completed the involved paperwork more quickly to allow Ervin to enter the community corrections program approximately thirty days early at Kile's request. Conners added that upon meeting Ervin, the informant had given no indication that threats were involved in his decision to assist the authorities. Having heard this testimony, the trial court found that even if Ervin had made such a statement: "people who are in jail who are going to testify against somebody are very nervous about it generally anyway, and they may say anything to another inmate, and I can't grant new trials based on that sort of extrinsic evidence." After analyzing the record with the aforementioned standards in mind, we see no abuse of discretion in the trial court's denial of relief relative to this issue.

## Sufficiency

The defendant also challenges the sufficiency of the evidence supporting the jury's verdicts. More specifically, the defendant points to the alleged chain of custody problem and avers that the chief proof against him consists of poor quality audio tapes and a convicted felon's testimony.

When an appellant challenges the sufficiency of the evidence, this Court is obliged to review that challenge according to certain well-settled principles. A verdict of guilty, rendered by a jury and approved by the trial judge, accredits the testimony of the State's witnesses and resolves all conflicts in the testimony in favor of the State. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. Id. The relevant question the reviewing court must answer is whether any rational trier of fact could have

found the accused guilty of every element of the offense beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Harris, 839 S.W.2d at 75. In making this decision, we are to accord the State the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom. See Tuggle, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence in evaluating the convicting proof. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." Matthews, 805 S.W.2d at 779.

Turning from the applicable caselaw to an examination of the proof before us viewed in the light most favorable to the State, the record supports the finding that the defendant's conduct fulfilled beyond a reasonable doubt all of the elements of the sale of .5 grams or more of cocaine and of a separate sale of less than .5 grams of cocaine. See Tenn. Code Ann. § 39-17-417. The defendant was known to the informant. The latter individual was searched on two separate days; was provided money to purchase drugs; was followed to the defendant's residence; was seen having emerged from the defendant's home; and was followed back to the armory. There Ervin presented the police with cocaine on both of these occasions. Ervin added that he had purchased the substances from the defendant. Subsequent testing of the rocks obtained in the first transaction revealed that these were comprised of .7 grams of cocaine base. And as previously noted, examination of the rock from the second sale disclosed that it was made up of .3 grams of cocaine base.

While admittedly in Ervin the State did not have an ideal witness, the jury was aware that he had three prior drug convictions for selling cocaine and that he had co-operated with the State in order to be placed on community corrections one month earlier than he otherwise would have been. On cross-examination Ervin further acknowledged that he had since violated the terms of his placement on community corrections by testing positive for cocaine usage and was re-incarcerated at the time of trial. However, the jury was entitled to believe what it wished of his testimony since the credibility of witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted exclusively to the jury as the trier of fact. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984). We also observe that proof existed corroborating portions of his accounts. In view of this and our above-conclusion that the chain of custody allegation lacks merit, we find the evidence legally sufficient to sustain his convictions.

**Probation Revocation**

In his final issue the defendant contends that his statutory[10] and due process rights were violated by failure to receive written notice of the grounds to be used in revoking his probation.[11] As such, the defendant argues that this Court should reverse and/or remand the matter.

In Practy v. State, 525 S.W.2d 677, 680 (Tenn. Crim. App. 1974) (citing Gagnon v. Scarpelli, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973) and Morrissey v. Brewer, 408 U.S. 471, 92

---

[10] Following the assertion that a statutory right of his had been violated, the defendant cites Tenn. Code Ann. § 40-35-311; however, this Court fails to see mention of a notice requirement therein.

[11] The defendant also avers that the revocation was inappropriate since these convictions should be overturned based upon insufficient evidence. Having found the sufficiency allegation to lack merit, we will address this contention no further. It provides no basis for relief.

S.Ct. 2593, 33 L.Ed.2d 484 (1972)), this Court enunciated the constitutionally-mandated procedural due process standards applicable to a probation revocation proceeding. Quoting Morrissey, 92 S.Ct. at 2604, this Court then enumerated the "minimum requirements of due process" as including:

> (a) written notice of the claimed violations of [probation or] parole; (b) disclosure to the [probationer or] parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a "neutral and detached" hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking [probation or] parole.

Practy, 525 S.W.2d at 680.

With respect to the instant case, the petition filed against the defendant cites only his failure to report to his probation officer. Thus, there is no dispute that the defendant did not receive written notice concerning the use of the convictions at issue here as the basis for his revocation. However, at the close of the defendant's sentencing hearing conducted on December 6, 1999, the trial court indicated that it was revoking the defendant's probation based on these convictions. At that point the prosecution reminded the court that the stated violation had related to other matters such as the defendant's failure to report. In response the trial court re-iterated its intention to revoke the defendant based upon the new convictions. Nevertheless at the request of defense counsel, the trial court agreed to postpone the revocation until the hearing on the defendant's new trial motion. When the latter took place more than one month later, the defense did not attempt to put on any evidence to controvert the validity of the convictions. The court made reference to the trial of these offenses and entered the aforementioned revocation.

From the above facts it becomes apparent that while the defendant did not receive written notice, he had actual notice of the intent to use the instant convictions to revoke his probation. Though written notice is preferred, this Court has previously held that actual notice will suffice to meet the due process requirements in a revocation of probation proceeding. See, e.g., State v. Clifford W. Jackson, No. 02C01-9802-CR-00041, 1999 WL 615742 at *4 (Tenn. Crim. App. at Jackson, August 13, 1999); State v. James C. Wolford, No. 03C01-9708-CR-00319, 1999 WL 76447 at *7 (Tenn. Crim. App. at Knoxville, Feb. 18, 1999); State v. Peck, 719 S.W.2d 553, 557 (Tenn. Crim. App. 1986); Stamps v. State, 614 S.W.2d 71, 73-74 (Tenn. Crim. App. 1980). We, therefore, find this issue to lack merit also.

**Conclusion**

For the foregoing reasons we find that none of the defendant's allegations merit relief. Accordingly, the judgment of the trial court is AFFIRMED.

---

JERRY L. SMITH, JUDGE