IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 14, 2014 Session

**RICARDO DAVIDSON v. STATE OF TENNESSEE**

**Direct Appeal from the Circuit Court for Maury County**
**No. 18968      Stella Hargrove, Judge**

**No. M2013-01645-CCA-R3-PC - Filed July 31, 2014**

The petitioner, Ricardo Davidson, appeals the denial of his petition for post-conviction relief. The petitioner was convicted by a jury of possession with intent to sell 300 grams or more of cocaine within a Drug Free School Zone, conspiracy to possess with intent to sell or deliver over 300 grams or more of cocaine within a Drug Free School Zone, possession with intent to sell or deliver ten pounds or more of marijuana within a Drug Free School Zone, conspiracy to possess with intent to sell or deliver over ten pounds of marijuana in a Drug Free School Zone, and possession of unlawful drug paraphernalia.  He was subsequently sentenced to an effective term of fifteen years in the Department of Correction.  Following the denial of his direct appeal, the petitioner filed a petition for post-conviction relief alleging that he was denied his right to the effective assistance of counsel.  On appeal, he specifically contends that trial counsel was ineffective by: (1) failing to adequately argue the motion to suppress; (2) failing to argue the issue of the racial makeup of the jury on the Motion for Acquittal or New Trial; and (3) failing to make an argument for and request a jury instruction under the natural and probable consequence rule.  The petitioner further alleges that both trial and appellate counsel were ineffective in failing to adequately communicate with him during their respective representations.  Following review of the record, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and ROGER A. PAGE, JJ., joined.

Seth M. Lasater, Columbia, Tennessee, for the appellant, Ricardo Davidson.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Senior Counsel; Thomas M. Bottoms, District Attorney General; and Brent Cooper, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Procedural History

The charges in this case arose from law enforcement officers' interception of a package containing drugs which was mailed from California to Columbia, Tennessee. On direct appeal, this court provided the following summary:

> This case arises from law enforcement officers' interception of a mailed package that was believed to contain drugs. After obtaining a search warrant to open the package, the officers discovered it contained drugs. They then delivered the package to the intended address, where they also executed a second search warrant and found more drugs. A Maury County grand jury indicted the [petitioner] for four felony drug offenses and possession of drug paraphernalia. The [petitioner] filed a motion to suppress the evidence obtained as a result of the search warrants.

*State v. Ricardo Davidson*, No. M2010-02002-CCA-R3-CD, 2012 Tenn. Crim. App. LEXIS 333, *2 (Tenn. Crim. App. May 17, 2012), *perm. app. denied* (Tenn. Aug. 16, 2012). As noted, the charges against the petitioner were: (1) possession of more than 300 grams of cocaine with intent to sell within a Drug Free School Zone; (2) possession of over ten pounds of marijuana with intent to sell within a Drug Free School Zone; (3) conspiracy to possess over 300 grams of cocaine within a Drug Free School Zone; (4) conspiracy to possess and deliver over ten pounds of marijuana in a Drug Free School Zone; and (5) possession of drug paraphernalia. *Id*. at *1.

### a. Search Warrants

Although not specifically contained within the record before us, there is mention made of an initial search warrant which was obtained by police officers to search the actual package at United Parcel Service ("UPS") prior to its delivery. Apparently, in that warrant, that the package in question was addressed to Jerry Fryson at 638 Mooresville Pike in Columbia. That warrant was executed, and a drug dog indicated that drugs were present in the package. Officers then opened the package and found marijuana inside. After confirming the presence of the drugs, officers resealed the package and sought the second warrant.

The affidavit in support of the second warrant submitted by Brian W. Cook of the Maury County Sheriff's Department, reads as follows:

[T]here is probable cause to believe that Jerry Fryson, Ricardo Davidson, and Dana Malave or the occupants of . . . 638 Mooresville Pike, Columbia, Maury County Tennessee is/are in possession and control of certain evidence of a crime . . . and that evidence of said crimes will be found at the location 638 Mooresville Pike, Columbia, Maury County Tennessee.

In the section titled "Statement of Facts In Support of Probable Cause," the affidavit states:

On July 2nd 2007, your affiant received information from Task Force Officer Mike Perez of the D.E.A. about a UPS parcel labeled with tracking number 1Z91E11190152026318 that was shipped to Columbia TN from Los Angeles CA. The information about the parcel came from Andrew Smith a Los Angeles Police Department Police Officer assigned to the LAPD parcel squad of the Narcotics Division. According to Officer Smith the shipping process utilized for the parcel is consistent with previously interdicted parcels which have contained narcotics/controlled substances.

On July 3rd 2007, your affiant learned that Task Force officer Mike Perez came in contact with the UPS parcel with tracking number 1Z91E11190152026318 at the Columbia TN UPS hub. Canine officer Kyle Cheek along with canine drug detector Diesel conducted a sweep for the odor of narcotics on three similar parcels including the UPS parcel labeled with tracking number 1Z91E11190152026318. According to Canine handler Cheek, canine drug detector Diesel exhibited behavior consistent with narcotics odor identification eminating [sic] from UPS parcel labeled with tracking number 1Z91E11190152026318.

On July 3rd 2007, Task force Officer Mike Perez obtained a search warrant for the UPS parcel with tracking number 1X91E11190152026318. Upon issuance of the search warrant for the UPS parcel with tracking number 1Z91E11190152026318, your affiant located one package of marijuana within the parcel.

After reciting a list of his experience and training in support of his basis of knowledge, the affiant continued:

[It]t is your affiants experience that there will be records and other information that will further the investigation into the drug trafficking of the said individual. It is your affiants training and experience that the said drug traffickers will have bogus names put onto the packages in an attempt to hide their true identity. Your affiant along with Lt. Bill Doelle did drive by the

-3-

residence and did run two vehicle tags with one coming back to a Dana Malave at 638 Mooresville Pike and when checking on Miss Malave's name through numerous computer look up programs did come across the name Ricardo Davidson as a residen[t] at the same address. Therefore it is your affiants belief and training that Miss Malave and [the petitioner] are the current residen[ts] at 638 Mooresville Pike and they are who the said package is intended to be delivered to.

In the actual warrant issued, it provides that:

This search warrant will only be authorized and will only be executed AFTER the following events, which are anticipated, take place:

> 1. The successful delivery of a UPS packed 1Z91E11901520563l8 containing one package of marijuana . . . to the address of 638 Mooresville Pike Columbia TN 38401. This delivery will be made by a law enforcement officer acting in an undercover capacity.

> 2. An occupant of this residence or someone with control over this residence will accept delivery of the package as it is presented to them by a law enforcement officer acting in an undercover capacity.

## b. Suppression Hearings

The trial court conducted two hearing on the motion to suppress. The proof presented, as summarized from the direct appeal opinion, is as follows.

> At the first hearing on the motion to suppress, neither party presented evidence other than the search warrants themselves. The parties offered the trial court arguments based upon the warrants. The defense argued that there was no nexus between the affidavit and the address searched. Defense counsel noted that this case involved a suspicious UPS package that was opened, and, based upon its contents, law enforcement officers obtained a search warrant. Defense counsel assumed that the address for which they obtained the search warrant was the address to which the UPS package was addressed, but defense counsel argued that nothing in the affidavit alleged that fact.

> The State conceded that the affidavit supporting the search warrant

-4-

never specifically stated that the address that law enforcement officers sought to search was the same address as that listed on the UPS package. The State asserted, however, that when the search warrant was read as a whole, it was obvious from the search warrant that such was the case. The State further noted that the affidavit stated that the officer swearing to the affidavit believed, based upon his knowledge and experience, that the two people listed in the affidavit, who were the occupants of 638 Mooresville Pike, Columbia, Tennessee, were anticipated to take possession of the package.

Defense counsel countered that the package was addressed to a man named "Jerry Fryson" and not to the [petitioner]. Defense counsel then asked to file an amended motion based upon the law enforcement officer's alleged "intentional" act of omitting the address of the recipient of the package when seeking a search warrant for the [petitioner's] residence. The trial court granted the [petitioner's] request to file an amended motion and set a hearing for a later date.

At the hearing on the amended motion to suppress, the parties presented the following evidence: Michael Perez, a Nashville Drug Task Force officer, testified that this investigation began on July 2, 2007. On that day, he received a phone call from "Andy," an officer with the Los Angeles Police Department who worked in the parcel narcotics unit. Andy advised Officer Perez that there was a package that he suspected contained narcotics or narcotics proceeds coming to Columbia, Tennessee, from the Los Angeles area. Based upon this information, Officer Perez contacts Special Agent Mabry with the Tennessee Bureau of Investigation and asked if he had a law enforcement contact in the Columbia area. Agent Mabry confirmed he did have a contact and called the Maury County Sheriff's Department for assistance in a potential controlled delivery of the package.

Officer Perez testified that he and Agent Mabry, along with other officers, went to the UPS facility before the package was placed on the outgoing delivery truck. The officers used a dog, trained as a drug detector, to identify whether the package may be emanating odors of narcotics. The drug dog indicated positively on the package, which was addressed to Jerry Fryson. The address listed was 638 Mooresville Pike in Columbia, Tennessee. Officer Perez said, based upon this information, the officers obtained a search warrant to open the package. Inside the package, they found foam under which was located marijuana. Officer Perez said that, upon finding the marijuana, the officers did not disturb the package further, hoping to

successfully conduct a controlled delivery of the package.

Officer Perez testified that he went with Maury County Sheriff's Department officers as they executed "an anticipatory search warrant" at the address listed on the package. He said he did not personally identify who lived at that address, and he was not involved further in the investigation until after the execution of the second search warrant.

On cross-examination, Officer Perez testified that he attempted to determine whether Jerry Fryson was a real person. He explained that he searched the Tennessee driver's license files for a "Jerry Fryson." Officer Perez read from the affidavit requesting the search warrant, wherein another officer, Officer Brian Cook, swore that the search revealed that there was no person with the name Jerry Fryson licensed in the State of Tennessee. The affidavit further stated that individuals dealing in controlled substances very often create false names for parcels to conceal their true identities.

Officer Brian Cook, with the Maury County Sheriff's Department testified that he was assigned to the Drug Task Force in 2007. He said that he was present on July 3, 2007, when the suspicious box was opened at the UPS facility. Upon opening the package, officers discovered that it contained illegal narcotics, and they resealed the package for a controlled delivery. Officer Cook said he typed an "anticipatory search warrant" to serve on the residence after delivery of the package. Officer Cook said he listed "Jerry Fryson" as one of the people to be searched, but he did not specifically indicate in the warrant that the package was addressed to "Jerry Fryson."

Officer Cook testified that the affidavit indicated that, based upon Officer Cook's belief and training, "Miss Malave and Mr. Davidson are the current residen[ts] at 638 Mooresville Pike, and they are who the said package is intended to be delivered." The officer agreed that the affidavit does not state in "plain language" that the package was addressed to 638 Mooresville Pike.

On cross-examination, Officer Cook testified he did not intentionally omit from the affidavit that the package was addressed to Fryson but stated that he listed him as a person to be searched. He further stated that, after learning the package was addressed to 638 Mooresville Pike, he and another officer, Lieutenant Bill Doelle, drove by that address and ran the vehicle tags of the two cars parked at the residence. One of the two cars was registered to Dana Malave. When the officer ran Malave's name through law enforcement

-6-

computer programs, the programs listed the [petitioner] as her acquaintance who also lived at the same address. Officer Cook testified that the package was successfully delivered to 638 Mooresville Pike and that it contained around three pounds of marijuana and a kilogram of cocaine.

On redirect examination, Officer Cook testified that he checked to see if either Malave or the [petitioner] were suspected drug traffickers, and they were not. He agreed that the only link between Malave, the [petitioner], and the package was that they were residents of the address listed on the package.

Upon questioning by the trial court, Officer Cook testified that the marijuana contained in the box had a value of $3,000 and the cocaine had a value of $26,000.

*Id*. at **2-8. Also admitted into evidence at the hearing was a narrative from the incident report which provided more detail of the delivery of the package. The narrative notes that, "[a]n agent with the TBI did deliver the package to 638 Mooresville PK and the package was placed on a red 4-wheeler in the front yard and then the package was moved by a black male to the shed beside the house. Officers then executed the search warrant . . . ."

## c. Trial Court's Ruling

After hearing the evidence presented, the trial court denied the petitioner's motion to suppress. In so doing, the court found:

The Fourth Amendment of the U.S. Constitution, and the corresponding provisions of the State constitution, do not absolutely prohibit searches. They just prohibit unreasonable searches and seizures.

In this case, State and local officers, based on reliable information from fellow officers in California, began an investigation. That investigation was of a package addressed to 638 Mooresville Pike, they first p[erus]ed the interior of the package to confirm whether it did contain controlled substances, and they confirmed at least one controlled substance in the package before we sought the second warrant, and performed then the delivery and the eventual execution of that second warrant.

I think the second warrant, as I said in February, on its face, states or implies - and I'll have to say, mostly implies - that the package is addressed to 638 Mooresville Pike, and to one or more of those persons that resided

-7-

there.

They had gone far enough to investigate the vehicles and who those vehicles were registered to at that address, and naming people that they believed to be living there, based on their investigation, and that they had reason to believe, based on their experience, which I think people with sufficient experience may state opinions, in court, and certainly in search warrants.

And that they had some reason to believe that Mr. Fryson may not exist, but at the same time, there may be something there at the residence with that same spelling or phonetic similarity to that spelling. And the magistrate had probable cause, based on what was contained within the four corners of the second . . . affidavit, . . . to issue that second warrant . . . .

If the magistrate has the authority to also consider what he did an hour and 35 minutes earlier, at 8:55, before the 10:30 second warrant, there is even stronger proof that Jerry Fryson . . . did not appear to exist, as a person licensed to drive a vehicle in Tennessee, and that it was appropriate to look at who might reside at that residence for probable cause purposes.

[Defense Counsel], the reason I asked about the value of the substance, there is pretty strong proof that someone is not going to mail $39,000.00 worth of controlled substances to an address on Mooresville Pike if they have absolutely no idea about who is going to get it. And the people that live at that address are the most likely people to receive it.

So somebody that put that address on a box must have expected that the occupants of that residence to be the ultimate recipient of the intended delivery. And I've not heard any evidence in this record that anyone named Jerry Fryson or Jerry Frierson, . . . lived at that address or that there was any mistaking the 638 address, or that this package was intended for anyone other than persons in possession of [the residence at] 638 Mooresville Pike.

. . . .

I believe you can make reasonable inference from the facts stated, and the facts stated here are that they anticipate delivering this box to 638 and that these two defendants are the occupants of that residence. And that, therefore, it's reasonable under the Constitution, to conduct a search of those premises

and the people in charge or in possession of those premises.

*Id*. at \*\* 8-11.

### d. Trial

Following the denial of the motion to suppress, the petitioner proceeded to trial on the charged offenses. The relevant facts of the case, as recited on direct appeal, are stated as follows.

On July 2, 2007, DEA Task Force Officer Michael Perez received information from Los Angeles Police Department Detective Andrew Smith that a suspicious package was coming to Columbia, Tennessee, via UPS. The package was addressed to Jerry Fryson and was to be delivered to 638 Mooresville Pike in Columbia, Tennessee. Agent Mabry attempted unsuccessfully to locate an individual by the name of "Jerry Fryson" in public databases. Agent Mabry was not surprised by his failure to locate a "Jerry Fryson" because, he said, packages of this nature often bear a fictitious name.

Officers went to the UPS facility with a K-9 drug dog officer. The K-9 officer smelled several packages and alerted officers to a packaged addressed to "Jerry Fryson." Based upon the information from the Los Angeles Police Department officer and the K-9 officer's alert, officers obtained a search warrant to open the package, and, when they did, they found a white foam packaging material beneath which was a leafy green substance that they deemed was narcotics. Once the officers confirmed there were narcotics inside the box, they put the box back together so it could be delivered to the address in order to identify the intended recipients of the illegal drugs in a controlled manner.

Officers applied for and were granted an "anticipatory search warrant." The warrant required that certain events happen before the warrant could be executed. In this case, the package had to be delivered to the house before the warrant could be executed. The search warrant included the names Jerry Fryson, Dana Malave, and the [petitioner] as the potential people to be searched.

While other officers conducted surveillance, Officer James Whitsett, who was assigned to the DEA in Nashville, delivered the box. Officer Whitsett, dressed as a delivery man, took the box to the residence. There, the

[petitioner] approached him and said that the package belonged to him. Oficer Whitsett handed the [petitioner] the package, and the [petitioner] set it down and then picked it back up and took it to an "outbuilding" or "little barn" that was adjacent to the residence. Once the box was delivered, officers executed the search warrant on the residence and the outbuilding where the [petitioner] had taken the box. Officers found the box and noted that it had not yet been opened. In the shed, officers also found plastic baggies on a work bench, a large box that contained scales, and a duffle bag that contained large blocks of marijuana and a Bible. The Bible contained writing that said it had been presented to "Jason Coleman" and listing his address as Wasco State Prison. The letters, written in April and August of 2006, were read into evidence and seemingly discussed some illicit activity. Other mail found inside the residence linked Malave and the [petitioner] to the residence.

In the master bedroom of the residence, officers found a plastic tote that contained marijuana, plastic wrap, a set of scales, paper plates with some loose marijuana, a utility knife, and a bag that contained plastic baggies.

Officers interviewed the [petitioner], who initially said that he did not know what was in the package and that it belonged to Malave. Later, the [petitioner] said that he had been receiving packages for a man named "Jay Colemen." Officer Whitsett was familiar with Coleman and had previously investigated him previously for carrying large sums of currency. Coleman had been arrested on several occasions for drug related activity in both Tennessee and California. The [petitioner] told officers that he received $500 for accepting each package, and, while he was unsure what the packages contained, he believed they contained narcotics. Officers attempted without success to contact "Jay Coleman." The [petitioner] also told police officers that the marijuana discovered in his bedroom did not belong to him. He said that he was waiting for someone to come and pick it up.

TBI Agent Jennifer Sullivan analyzed substances contained in the package. She determined that the box contained 28.8 pounds of marijuana and 996.4 grams of cocaine, 6 tenths of a gram less than a kilogram of cocaine. Agent Sullivan also tested the digital scales found in the residence and found cocaine on the scales. Lieutenant William Doelle testified that the street value of the marijuana was almost $60,000, and the street value of the cocaine was $99,640 if it remained in the powder form and up to $400,000 if the cocaine was altered to crack cocaine.

Officers measured the distance from the [petitioner's] house to a nearby child care facility. They determined that the residence was less than 1000 feet from a licensed day care facility.

The [petitioner] offered evidence that he raced motorcycles locally and also fixed them in his shop. The defense presented multiple police officers who testified that they had paid the [petitioner] to work on their motorcycles either at the [petitioner's] motorcycle shop or at the [petitioner's] house. In order to obtain parts to fix the motorcycles, the [petitioner] ordered and received many packages containing motorcycle parts, which were usually delivered by UPS or FedEx.

Regarding the events that surrounded the [petitioner's] arrest, Sheila Duke testified that she and her children went to a cookout at the [petitioner's] house on July 2, 2007, at around 6:00 p.m. Her boyfriend, Mark Booker, met them there later that night. Duke recalled that the [petitioner], the [petitioner's] girlfriend, Dana Malave, and a man named "Jay" were present. Mark Booker testified that "Jason Coleman" was at the [petitioner's] house on July 2, 2007, while they were "cooking out." He said he knew Coleman through the [petitioner] and knew that Coleman raced four-wheelers.

Dana Malave testified that she and the [petitioner] had three children and that, in July 2007, the [petitioner] worked on motorbikes out of a shed at their home. Malave said she knew Jason Coleman. Coleman had purchased a motor bike from the [petitioner], and on July 2, 2007, Coleman was at the house intermittently, leaving and returning several times. Coleman ate dinner with them and left for the last time at around 9:30 p.m. Malave said that, when she went into her bedroom after Coleman left, and there was a plastic tote in the bedroom. The [petitioner] told her that Coleman had left the tote and would return later that evening to retrieve it. Coleman, however, never returned to retrieve the tote. Malave claimed that neither she nor the [petitioner] knew the contents of the tote.

The [petitioner] testified and explained that he often ordered and received packages of motorcycle parts for his motorcycle repair work. He said that he used plastic wrap to wrap motors, and he used plastic bags to organize motorcycle parts. He explained that he used scales to weigh nitrous oxide, which he used to make motorcycle engines faster. The [petitioner] said that he knew Jason Coleman and that the two met approximately three years before the [petitioner's] arrest when Coleman brought him a bike to repair. He said

-11-

he fed Coleman's dogs while Coleman was incarcerated. The [petitioner] confirmed that Coleman brought a blue tote to his house on July 2, 2007, saying he would return shortly to retrieve it. The [petitioner] said Malave told him the tote smelled and asked him to remove it. The [petitioner] said he was expecting a package of motorcycle parts on July 3, 2007. They were to be delivered by UPS, and, when the UPS man arrived, he assumed the box contained the parts he was anticipating. The [petitioner] denied knowing the package contained drugs and denied having an agreement with Coleman to receive the package in exchange for $500.

*Id*. at **11-17.

After hearing the evidence presented, the jury convicted the petitioner as charged. Prior to a sentencing hearing being held at which evidence was presented, the petitioner and the State reached an agreement that the petitioner would receive an effective fifteen-year sentence for his crimes, receiving the minimum sentence as to each count to be served concurrently. Prior to this, the trial counsel had filed his "Motion for Judgment of Acquittal, or in the Alternative, a New Trial" in which he raised six issues. The issues raised were: (1) whether the verdict was against the weight of the evidence; (2) whether the verdict was against the applicable law; (3) whether the search of the petitioner's home and person was in violation of the state and federal guarantees against unreasonable searches and seizures; (4) whether the Drug Free School Zone law, as applied to the petitioner, was unconstitutional in that it denied him due process and the punishment constituted cruel, unusual, and excessive punishment; (5) whether the petitioner was denied due process, a fair trial and a trial by jury of his peers in that the jury pool, panels, and venire did not include a fair representation of African-Americans; and (6) whether the procedures used by the clerk in excusing jurors from service in the petitioner's trial violated Tennessee's laws for excusing jurors, contributing to under-representation of African-Americans on the jury panels. Trial counsel submitted his motion to the court without further argument.

The trial court thereafter denied the motion for new trial. As trial counsel was preparing for the appeal, the petitioner began expressing a lack of faith in trial counsel. Counsel withdrew, and substitute counsel was appointed for purposes of the appeal.

On appeal, the single issue raised for review was whether the trial court had erred in denying the motion to suppress the evidence because it was obtained pursuant to an invalid search warrant. *Id*. at *18. However, appellate counsel attacked the denial of the motion on different grounds than those pursued by trial counsel at the trial level. Specifically, appellate counsel attacked the warrant on grounds that: (1) the "anticipatory" search warrant, considered alone, failed to establish probable cause because the supporting affidavit failed

to specifically state how the officer had acquired any information relating to the UPS package and failed to provide the reliability of his sources in reference to the package; (2) the warrant listed the wrong tracking number for the package, and that this was not a typographical error, making the warrant invalid; and (3) that the affidavit accompanying the warrant contained misleading information. *Id*.

After review, this court concluded that the affidavit established probable cause for the magistrate to issue the anticipatory search warrant. *Id*. With regard to the tracking number discrepancy, the court concluded that the petitioner had waived the issue by failing to raise it in the motion to suppress or at the hearing. *Id*. The court, however, did note that clerical or typographical errors, such as the ones in this case, will not invalidate an otherwise valid search warrant absent a showing of prejudice to the defendant. *Id*. (citing *Collins v. State*, 199 S.W.2d 96, 97 (1947)). The court held that the affidavit included language specific enough to support the issuance of the warrant. *Id*. at **25-26. Having so concluded, this court affirmed the decision of the trial court. Thereafter, the Tennessee Supreme Court denied permission to appeal. *Id*. at *1.

### e. Post-Conviction

The petitioner filed a timely pro se petition for post-conviction relief and a supporting memorandum of law. In the petition, the petitioner attempted to challenge various constitutional infirmities, as well as challenging trial counsel's performance. Following the appointment of counsel, an amended petition was filed. A hearing was held at which the petitioner, trial counsel, and appellate counsel each testified.

The petitioner testified that he hired trial counsel to represent him in the case in 2007, approximately three months after the offense happened. Trial counsel began his representation in general sessions court.

The petitioner acknowledged that trial counsel had filed a motion to suppress. However, he complained that trial counsel had failed to raise the correct arguments and adequately argue at the hearing. He wanted trial counsel to argue that the anticipatory warrant was not executed properly because the package was not "delivered" to a person, rather it was left on a 4-wheeler rather than being placed into a person's hands. Because "delivery" was a prerequisite to the execution of the warrant, the petitioner contended that the warrant was not authorized. He faulted trial counsel for failing to discuss this with him or argue the issue to the court.

The petitioner also faulted trial counsel for failing to argue at the motion to suppress hearing that there was a discrepancy in tracking numbers listed in the affidavit. The

petitioner is correct that the affidavit referenced package number . . . 26318, but the package number was in reality . . . 56318.  This issue was never discussed by trial counsel, but the petitioner noticed the discrepancy and thought trial counsel should have recognized that it was an issue to argue.  The petitioner did acknowledge that the discrepancy was only one number, and, on cross-examination, he admitted the number was correct on the warrant and was probably just a "typographical error."

The petitioner also acknowledged that the address for delivery was his home address, although the package was addressed to someone else.  He further acknowledged that he picked the package up off the 4-wheeler and moved it into the shed.  He stated that he ran a motorcycle shop and thought that the package contained parts he had ordered.  He testified that he never opened the package.  The petitioner did acknowledge that law enforcement officers took no action until he had placed the package inside of the shed.  He further acknowledged that officers found twenty-two pounds of marijuana in a different location on the property and found three to four pounds in a tote bag in the petitioner's bedroom.  Additionally, officers found scales with cocaine residue on them inside the workshop where the petitioner took the package.

The petitioner's second complaint against trial counsel was that he failed to secure the presence of Jason Coleman, a friend of the petitioner's, to testify at trial.  The petitioner testified that he informed trial counsel that Mr. Coleman needed to testify, and he felt that trial counsel should have done whatever was necessary to ensure that that occurred.  He did acknowledge that trial counsel had filed a petition with the court to deem Mr. Coleman a material witness in the case.  The petitioner further acknowledged that trial counsel, upon learning that Mr. Coleman was in California, hired an out-of-state attorney to try to secure his presence at trial.  However, the petitioner felt that trial counsel did not do his best to find Mr. Coleman for trial.  While acknowledging that he was a friend of Mr. Coleman, the petitioner testified that he refused to aid trial counsel in serving a subpoena on Mr. Coleman's father to try to get information regarding Mr. Coleman's whereabouts.  The petitioner testified that he was not aware what Mr. Coleman would have actually testified to had he been secured as a witness.  He did point out that evidence was presented at trial that a bible with Mr. Coleman's name in it was found in the duffel bag containing the twenty-two pounds of marijuana.

The petitioner, an African American, next faulted trial counsel for failing to adequately raise and argue an issue regarding the lack of African Americans on the jury.  The petitioner acknowledged that trial counsel did raise the issue pre-trial and that it was raised in the motion for new trial.  However, it was not raised on appeal.  The petitioner stated that there was a hearing conducted on the matter pre-trial at which trial counsel argued.  He further complained that, although trial counsel listed the issue in the motion for new trial, he

did not make any oral argument with regard to the motion. Instead, trial counsel submitted the motion on the merits and the arguments contained within it. The petitioner testified that he did not authorize this decision.

The petitioner testified that trial counsel was playing chess on his computer during the trial. According to the petitioner, he did not address this issue with trial counsel because he trusted him. However, trial counsel did not really seem to be paying attention to the trial. The petitioner also testified that trial counsel failed to investigate and prepare a defense for the trial. He specifically testified that he believed the defense of entrapment was viable and should have been investigated. He testified that trial counsel failed to subpoena witnesses and should have investigated fingerprint evidence. The petitioner testified that trial counsel failed to argue pertinent issues. He claimed that a jury instruction should not have been given on criminal responsibility because it was not charged in the indictment, and he was not aware that he had to defend himself against the conduct of another. The petitioner also faulted trial counsel for failing to have the jury charged with the natural and probable consequences rule, which was an essential element of criminal responsibility. He acknowledged the rule was mentioned during the jury charge, but he claimed it was not adequately defined.

On cross-examination, the petitioner acknowledged that he chose to testify at trial, that it was his decision, and that he wanted to tell the jury himself that he was innocent. He further acknowledged that the evidence was indeed all found on his property after he picked up the package and transported into his shed, although he claimed he believed the package contained motorcycle parts. He told the jury that he used the scales found to weigh nitrogen tanks used in his repair of motorcycles. He acknowledged that trial counsel did introduce photographs of those tanks to the jury.

At the post-conviction hearing, the petitioner did acknowledge that trial counsel had almost three years to prepare for the case, and the petitioner was on bond during this period. However, he testified that for certain long periods he had no contact with trial counsel. The petitioner testified that the case was set for trial three or four times prior to the actual trial, but he claimed trial counsel did not inform him of the reasons for the continuances he was granted. He noted that trial counsel did inform him of an offer extended by the State which was for one year in the county jail followed by fourteen years' probation. However, the petitioner refused the offer because he maintained his innocence, and an acknowledgment of guilt was a prerequisite to the offer.

With regard to his appellate counsel, the petitioner faulted him for raising only one issue on appeal. He acknowledged that sufficiency of the evidence was included in the motion for new trial, but it was not raised on appeal, which he claimed limited his appeal.

The petitioner testified that appellate counsel failed to discuss the possibility of filing an amended motion for new trial raising other issues which had not been included. The petitioner testified that he basically never really talked to appellate counsel at all.

The next witness to testify was trial counsel. He testified that he had been practicing law since 1986 and that his case load involved ninety percent criminal work. He testified that he had handled multiple drug cases during his career and was familiar with anticipatory search warrants and the legalities of them.

Trial counsel testified that he felt that he did a good job in helping the petitioner and keeping him "in the loop" with regard to the case. He stated that he communicated with the petitioner primarily by letter or by telephone, but he noted that the petitioner dropped into his office on several occasions. He noted that, in the almost three-year preparation of the case for trial, he might have been out of touch with the petitioner for two to three months on a few occasions. Trial counsel testified that it was unusual for a case of this nature to linger in the court system for almost three years. He explained that this was in large part due to the continuances trial counsel kept requesting in order to find witnesses and prepare the defense. With regard to the allegation that he played chess on his computer during the trial, trial counsel stated that he would have only done so during jury instructions or during a delay in the proceedings. He was adamant that he did not play games during any argument or testimony.

With regard to plea offers from the State, trial counsel recalled one early in the case for ten years at thirty percent. However, when he presented the offer to the petitioner, the petitioner vehemently refused to consider the offer. He maintained that he was innocent and that he would not spend one day in jail. The petitioner refused to even submit a counteroffer to the State.

Trial counsel testified that he filed a motion to suppress while the case was in general sessions court. He recalled that the general sessions court denied the motion and bound the case over to the grand jury. Trial counsel recalled that he felt very strongly about the warrant issue he raised in the motion to suppress. He focused upon the fact that there were lots of details contained in the first warrant which were not included in the second, and no reference was made to the first in the second. Trial counsel felt that he had a strong argument on the issue. He testified that he was not aware of a discrepancy in the tracking numbers on the warrant and the affidavit. At the post-conviction hearing, he testified that he did not feel that the discrepancy was a major error, appearing to be just a typographical error, and noted there was no showing of reckless or intentional misrepresentation by the State. He testified that, even had he known of the issue, he probably would not have raised the issue in the motion to suppress. He felt that the negligent error would not have garnered any relief.

Trial counsel also testified that he and the petitioner had discussed the anticipatory nature of the warrant, that the package was left in the yard, and that the petitioner personally picked it up and carried it into his workshop. In trial counsel's opinion, he believed that this satisfied the delivery requirement noted in the anticipatory warrant. Trial counsel testified that he felt, based upon the petitioner's actions, he had no grounds upon which to challenge the delivery requirement in a motion to suppress. He further noted that, as the petitioner's representative, he was charged with choosing which issues to litigate, noting that if he chose issues with no chance of success, his credibility could be damaged before the court.

Trial counsel testified that he was aware of Jason Coleman as a possible witness and that he and the petitioner had discussed him repeatedly. He testified that he expended a great deal of effort in the case to try to secure Mr. Coleman's presence at the trial. He sought multiple continuances in his attempt to locate the witness. Trial counsel testified that through their intense investigation, they became aware that Mr. Coleman was in California. Trial counsel hired a California attorney to assist him in the attempt to locate Mr. Coleman. Trial counsel filed motions in both Tennessee and California in his attempt to secure Mr. Coleman's presence at the trial. He finally obtained an order from the court, but, when the order was to be executed, they discovered that Mr. Coleman's parole had expired, and he could not be found. Trial counsel also testified that he attempted to speak with Mr. Coleman's father in his search for the witness.

Trial counsel was never able to actually speak with Mr. Coleman, so he was unclear exactly what he would have testified to had he testified at trial or if it would have benefitted the petitioner's case. He did learn that the package sent to the petitioner had been sent from an address very near Mr. Coleman's listed parole address in California. Trial counsel also learned that Mr. Coleman flew from California shortly before the package was to be delivered and was picked up at the airport by the petitioner. Trial counsel stated that, if Mr. Coleman did not invoke his fifth amendment rights, this could be the information he would have testified to. Regardless, trial counsel was able to get some information regarding Mr. Coleman before the jury through defense witnesses and the fact that Mr. Coleman's Bible was located in the duffel bag found during the search.

Trial counsel testified that he was aware Mr. Coleman was listed as a co-conspirator on the indictment, although there was no actual indictment issued against him. Trial counsel testified that there was nothing illegal regarding unindicted co-conspirators and that it was a normal practice. Nothing in the action aided in the petitioner's defense. Trial counsel also testified that he was familiar with the entrapment defense. Based upon his experience, he did not believe that the defense was applicable to the petitioner's case. Trial counsel did not believe that they could show the lack of pre-disposition necessary to establish the defense based upon the drugs found in the petitioner's bedroom.

Trial counsel also testified that he raised the issue of the jury venire prior to trial. He testified that he filed a motion when he saw how under-represented African Americans were in the venire. He stated that he made *Batson* challenges and went even further by calling the Deputy Clerk to establish why there was under-representation in the jury pool. He argued that the manner in which members of the pool were being excused did not comply with the statute. However, the court again overruled his argument.

Trial counsel testified that, following the trial, he filed a motion for judgment of acquittal/motion for new trial raising multiple issues. The issues included sufficiency of the evidence, the denial of the motion to suppress, the under-representation of African Americans on the jury, and the Drug Free School Zone enhancement. Trial counsel testified that he was trying to hurry to get to the appeal so, if they were successful, the petitioner would spend less time in jail. He did not dispute that he did not argue the motion for new trial but rather submitted it solely on the arguments made at trial and contained within the motion. He testified that the issues had all been raised during the trial, and the record reflected that. He felt that no argument was necessary.

Trial counsel testified that he offered to do the petitioner's direct appeal for free, aside from the cost of transcripts, based upon his belief that the searches in the case were illegal. However, before the transcripts were prepared, trial counsel was informed by the petitioner that he no longer had faith in his representation. At that point, trial counsel instructed the petitioner that he needed to obtain new representation.

The final witness to testify was the petitioner's appellate counsel. He testified that he was appointed to represent the petitioner, met with him, and reviewed the issues. Appellate counsel testified that he did not file an amended motion for new trial, so his issues were limited to those raised in the motion for new trial by trial counsel. He conducted research on the issues, and he felt that he needed to focus on the issues with the best opportunity to get the convictions set aside. In his opinion, the strongest issue was the motion to suppress.

However, on appeal, with regard to the motion to suppress, he chose to focus on the discrepancy between the tracking numbers on the warrant and the affidavit. Appellate counsel testified that he believed this to be the strongest issue, although this court found the issue to be waived because it was not addressed in the motion for new trial. Appellate counsel also believed that the anticipatory warrant deficiencies were a strong issue.

Appellate counsel testified that he did not challenge the sufficiency of the evidence on appeal because he believed that, if the evidence was admissible, it was sufficient to establish the convictions. Appellate counsel also did not feel that the drug free school zone or the jury issues were strong enough to merit any relief on direct appeal.

Appellate counsel testified that he met with the petitioner one time for approximately an hour. He showed the petitioner the brief he had prepared, and the petitioner seemed pleased with his efforts. He did not feel that the petitioner disputed the plan to raise only the suppression issue on appeal.

After hearing the evidence presented, the post-conviction court, by written order, denied the petition for relief. The petitioner has timely appealed that decision.

**Analysis**

On appeal, the petitioner raises the issue of ineffective assistance of counsel. He contends that the post-conviction court erred in denying his petition because trial counsel provided ineffective assistance by: (1) failing to adequately argue the motion to suppress; (2) failing to argue the issue of racial makeup of the jury venire in the Motion for Judgment of Acquittal or in the Motion for New Trial; (3) failing to request and argue for a jury instruction regarding the natural and probable consequence rule; and (4) failing to maintain adequate communication with the petitioner. In order to obtain post-conviction relief, a petitioner must prove that his or her conviction or sentence is void or voidable because of the abridgement of a right guaranteed by the United States Constitution or the Tennessee Constitution. T.C.A. § 40-30-103 (2010); *Howell v. State*, 151 S.W.3d 450, 460 (Tenn. 2004). A post-conviction petitioner must prove allegations of fact by clear and convincing evidence. T.C.A. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1); *Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)). In an appeal of a court's decision resolving a petition for post-conviction relief, the court's findings of fact "will not be disturbed unless the evidence contained in the record preponderates against them." *Frazier v. State*, 303 S.W.3d 674, 679 (Tenn. 2010).

A criminal defendant has a right to "reasonably effective" assistance of counsel under both the Sixth Amendment to the United States Constitution and Article I, Section 9, of the Tennessee Constitution. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). The right to effective assistance of counsel is inherent in these provisions. *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984); *Dellinger*, 279 S.W.3d at 293. To prove ineffective assistance of counsel, a petitioner must prove both deficient performance and prejudice to the defense. *Strickland*, 466 U.S. at 687-88. Failure to satisfy either prong results in the denial of relief. *Id*. at 697.

For deficient performance, the petitioner must show that "counsel's representation fell

-19-

below an objective standard of reasonableness" under prevailing professional norms, despite a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 688-89. "In other words, the services rendered or the advice given must have been below 'the range of competence demanded of attorneys in criminal cases.'" *Grindstaff*, 297 S.W.3d at 216 (quoting *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The petitioner must prove that counsel made errors so serious that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. When reviewing trial counsel's performance for deficiency, this court has held that a "petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). The reviewing court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689). However, "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

"'[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'" *Burns*, 6 S.W.3d at 462 (quoting *Strickland*, 466 U.S. at 691). "[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland*, 466 U.S. at 691. "Counsel must conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed." *Baxter*, 523 S.W.2d at 932-33.

Prejudice in turn requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In *Strickland*, the Supreme Court noted that "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. The court clarified that prejudice "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

A claim of ineffective assistance of counsel raises a mixed question of law and fact. *Burns*, 6 S.W.3d at 461; *Grindstaff*, 297 S.W.3d at 216. Consequently, this court reviews the trial court's factual findings de novo with a presumption of correctness, unless the evidence preponderates against the trial court's factual findings. *Grindstaff*, 297 S.W.3d at 216. The trial court's conclusions of law on the claim, however, are reviewed under a purely de novo standard with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

## I. Failure to Adequately Argue Motion to Suppress

As his first issue of ineffective assistance, the petitioner contends that trial counsel failed to raise the issue of the discrepancy in the tracking numbers or challenge the "delivery" requirement of the anticipatory warrant in the motion to suppress. He contends that had trial counsel raised these two issues, the evidence would have been suppressed, and the case against the petitioner would have "crumbled." In denying relief on this ground, the post-conviction court found that trial counsel had zealously raised all appropriate issues and defenses on the petitioner's behalf.

After review of the record, we find nothing which preponderates against the post-conviction court's findings. Clearly, a motion to suppress was filed by trial counsel, and it was argued at two hearingws before the trial court. Trial counsel testified that he strongly believed that he had successfully raised issues to argue. In fact, he testified that, despite the trial court's denial, he was prepared to represent the petitioner for free on appeal because he believed so strongly in the suppression issues.

Trial counsel acknowledged that he did not argue for suppression based upon the discrepancy in the tracking numbers or the delivery requirement. In fact, he acknowledged that he was not even aware of the discrepancy in the tracking numbers from the affidavit to the warrant. He testified, however, that even if he had known, he did not believe that he would have raised the issue in the motion to suppress because he believed the issues he did raise in the motion were far more serious and viable issues. Trial counsel testified that he was aware of no intentional misrepresentation on the State's behalf in the discrepancy and that, without a showing of such, success was not likely. Basically, trial counsel did not believe that it was a viable issue, despite the petitioner's and appellate counsel's opinion to the contrary. However, this court obviously agreed with the trial counsel. Although finding the issue waived on direct appeal, this court did note that because there was other identifying information in the warrant, the typographical error in the tracking number did not render the warrant invalid. *Davidson*, 2012 Tenn. Crim. App. LEXIS 333, *25. This conclusion alone precludes the petitioner from showing an entitlement to relief on this issue.

With regard to the issue of whether the package was "delivered" to the petitioner, trial counsel testified that he and the petitioner discussed the issue. Trial counsel testified that he explained to the petitioner that his action of picking up the package and placing it inside the shop was sufficient to establish delivery and acceptance of the package; thus, the prerequisites of the anticipatory warrant were satisfied in his opinion. We must agree. As pointed out by the State, the petitioner failed to cite to any relevant caselaw which would indicate that "delivery" and "acceptance" were not satisfied by the petitioner's action.

We agree with the State that there is little caselaw to be found in Tennessee dealing with anticipatory warrants. It is clear that our supreme court has embraced the use of "anticipatory search warrants." *State v. Coker*, 746 S.W.2d 167, 172 (Tenn. 1987). Such warrants do not violate the fourth amendment if they are executed following delivery of the contraband. *State v. Wine*, 787 S.W.2d 31, 33 (Tenn. Crim. App. 1989). "The affidavit should inform the magistrate that the known or suspected contraband will be delivered in the immediate future and the basis for the affiant's knowledge that the item will be delivered." *Id*. (citing *United States v. Outland*, 476 F.2d 581 (6th Cir. 1973)). For example, the *Coker* Court found the affidavit in support of the anticipatory warrant to be sufficient where the affiant specifically alleged how the item to be seized would arrive on the premises to be searched. *Coker*, 746 S.W.2d at 172. It is also recommended that a magistrate who issues an anticipatory search warrant condition its execution upon the occurrence of a specified event, such as the delivery of the targeted package. *Wine*, 787 S.W.2d at 33. *See generally*, 2 W. LaFave, Search and Seizure § 3.7(c) at 96 (2nd Ed. 1987).

Other than the court's acceptance of anticipatory warrants and whether probable cause supports them, the State is correct that little more appears in our caselaw. However, the State references several cases from other jurisdictions which seem to indicate that the petitioner's actions were sufficient to fulfill the requirements of the warrant. *See United States v. Turner*, 491 F. Supp.2d 556, 560-61 (E.D. Va. 2007) (stating that the package that was the subject of the anticipatory warrant was accepted when a person at the address picked up the package from the porch and took it inside); *United States v. Vesikuru*, 314 F.3d 1116 (C.A.9 Wash. 2002) (stating that the anticipatory warrant was properly executed when the package was apparently taken into the house). We agree with the premise in these cases. The petitioner's acceptance of the package was established when he picked it up and carried it inside the premises. Having concluded that delivery and acceptance were established, trial counsel cannot be deficient for failing to challenge the issue in the motion to suppress.

## II. Racial Composition of the Jury

The petitioner next complains that trial counsel failed to sufficiently challenge the makeup of his jury, which contained no African Americans. The petitioner acknowledges

that trial counsel did raise the issue before the trial court and in his motion for new trial; however, he failed to actually present argument regarding the motion for new trial, instead relying on the motion and information contained in the record. The petitioner suggests "[t]his failure to vigorously argue this fundamental constitutional right amounts to trial counsel's ineffective assistance." In fact, the petitioner urges us to review this issue pursuant to *United States v. Cronic*. *See* 466 U.S. 648, 654 n.11 (1984) (Prejudice is presumed in certain cases in which there is actual or constructive denial of counsel. Constructive denial occurs when "the performance of counsel [is] so inadequate that, in effect, no assistance of counsel is provided." *Id*. The petitioner contends that "his trial counsel failed to actively advocate for his cause which resulted in constructive denial of counsel." We disagree.

In denying relief on this ground, the post-conviction court stated:

> Petitioner complained that no African Americans appeared for jury duty on the day the panels were called for his trial. He recognizes that [trial counsel] raised the issue at trial and in the Motion for New Trial. In his Motion [trial counsel] also challenged the procedure used by the Circuit Court Clerk in excusing jurors, thereby contributing to the underrepresentation of African Americans. Petitioner failed to demonstrate how the Clerk's procedure violated Tennessee law, as well as how he was prejudiced by her failure to follow the law. The Court finds that Petitioner, an African American, was well represented during voir dire by an attorney skilled in jury selection and appropriate challenges thereto. Moreover, Petitioner agreed that the Court conducted a full hearing on the issue of underrepresentation of African Americans. The Court finds that this ground has no merit.

Again, nothing in the record before us preponderates against this finding. Trial counsel testified that he felt it was a viable issue for the petitioner and that he diligently pursued it. That the trial court did not agree with his conclusion does not lead to a finding of ineffective assistance of counsel. The record supports that trial counsel zealously represented his client on this matter. Acknowledging this, the petitioner's main complaint now seems to center over trial counsel's failure to actually present argument to the court in support of the motion for new trial on this issue. He makes no other allegations as to what more trial counsel could have done to seek relief.

We are aware of no requirement which denotes that counsel must present argument in support of such motion. Trial counsel testified that he sometimes did and sometimes did not depending upon the court he was before. He was clear that all the issues raised in the motion for new trial in the case were well-established on the record and had been heard by the court at trial. He saw no need to actually reiterate the same arguments before the court.

We agree that was not required in order to provide effective assistance of counsel. Moreover, the petitioner has failed to present any argument with regard to prejudice, other than his contention that we apply the *Cronic* presumption. Again, that is not appropriate in this case. Thus, the petitioner has failed to establish entitlement to any relief on this ground.

## III. Natural and Probable Consequence Rule

Next, the petitioner contends that trial counsel was ineffective for failing to request and argue for a jury instruction on the natural and probable consequences rule. According to the petitioner, because he was convicted under a theory of criminal responsibility, the jury should have been instructed on all the elements of criminal responsibility, including the natural and probable consequences rule. *See State v. Howard*, 30 S.W.3d 271 (Tenn. 2000). The petitioner maintains that the instruction was not given in his case and that trial counsel "did not know what instructions were and were not given, because he was playing chess on his computer during the instructions." Contrarily, in denying relief, the post-conviction court stated, "Petitioner did not offer any testimony on a 'charge of natural and probable consequence.' This charge is a part of the criminal responsibility charge, which the record reflects was properly given."

As pointed out by the State, the petitioner has failed to include a copy of the jury instructions with the record on appeal. Because he failed to supply this court with an adequate record for review, we must presume that the determinations made by the lower court are correct, *i.e.*, that the instruction was given. *See State v. Robinson*, 735 S.W.3d 136, 154 (Tenn. Crim. App. 2001). As also pointed out by the State, the record is not entirely clear that the petitioner was in fact charged under a theory of criminal responsibility, which would determine whether the instruction was even required.

Moreover, the petitioner testified at the post-conviction hearing that he recalled hearing something mentioned during the instructions about the natural and probable consequence rule. He just did not believe it was adequately explained. However, he makes no allegation of what further explanation was required. Incidentally, the petitioner also failed to even address the issue with trial counsel at the post-conviction hearing. Thus, we can reach no other conclusion other than that the petitioner has failed to carry his burden of establishing either deficient performance or prejudice.

## IV. Communication with the Petitioner

Finally, the petitioner contends that trial counsel and appellate counsel were ineffective by failing to maintain adequate communications with him during the pendency of the case. The post-conviction court disagreed, finding that both attorneys had provided

adequate communication to the petitioner. The record does not preponderate against the finding made by the court.

The testimony given by the petitioner and that of his counsel differ in content. On appeal, the petitioner asserts that trial counsel went for "great amounts" of time without contacting him. He contends that appellate counsel "never met with [him] after he was appointed to prosecute the appeal." Based upon this, the petitioner contends that "[i]t is evident that trial counsel failed to adequately discuss tactics and/or defense with" him.

However, at the hearing, trial counsel testified that he maintained good communication with the petitioner and kept him informed. While the two usually communicated by telephone or letter, the petitioner, who was on bond, did often stop by his office. Trial counsel testified that he always tried to meet with the petitioner if possible. Trial counsel noted that the case was pending for a period of almost three years. During that period, he recalled that the longest he had gone without communicating with the petitioner was two to three months. Additionally, appellate counsel testified that he reviewed the record, did research, and wrote an appellate brief raising what he considered to be the strongest issues. He testified that he met with the petitioner and discussed the brief and that the petitioner seemed pleased with his efforts.

Based upon its finding, the post-conviction court clearly accredited the testimony of the two attorneys. As noted, that is a determination that this court will not reweigh on appeal. *See State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003). Accrediting their testimony, the court then correctly determined that the petitioner had failed to establish deficient performance. Moreover, he made no argument as to how the alleged lack of communication prejudiced his representation. As such, he is entitled to no relief.

## CONCLUSION

Based upon the foregoing, the denial of post-conviction relief is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE